**Lori Diane GREINER, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

**Mona Belle WULFF, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

**Kimberly Jo SALO, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

**Joanne Elaine HYATT, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

**Shelly Marie OTT, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

**Robin Ann BARBEAU, Plaintiff,**

v.

**CITY OF CHAMPLIN, a Minnesota municipal corporation; Champlin Chief of Police Gene H. Kulander; Champlin Police Sgt. Allen Brunns; Champlin Police Officers Robert L. Penney and Jolene Sander, Defendants.**

Civ. Nos. 4–91–781 through 4–91–784, 4–91–864 and 4–91–865.

United States District Court, D. Minnesota, Fourth Division.

March 9, 1993.

Robert A. Hill, Hill Law Office, Minneapolis, MN, Robert W. Junghans, Junghans Law Office, Golden Valley, MN, for plaintiffs.

John K. Iverson, Erstad & Riemer, Minneapolis, MN, Paul D. Reuvers, Reuvers Law Office, Burnsville, MN, for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

Six separate lawsuits have been filed against the City of Champlin, Minnesota, the Champlin Police Chief, and three individual police officers. Each lawsuit involves a single plaintiff and the same five defendants. This matter is before the Court on plaintiff Lori D. Greiner's motion for partial summary judgment and defendants' motion of summary judgment in all six cases.

### FACTS

Plaintiffs Lori D. Greiner and Mona B. Wulff jointly own a home at 206 Elm Creek Road, Champlin, Minnesota. Deposition of Lori D. Greiner at 5. On July 13, 1991, Greiner and Wulff co-hosted a party at their home for approximately 20 to 25 women. The party started around 6:00 p.m. *Id.* at 40. Greiner and Wulff provided food and beverages, including a keg of beer and a bottle of root beer schnapps. *Id.* The party took place in the backyard, and a portable

stereo on the deck was playing music. *Id.* at 41, 48.

At approximately 1:30 a.m., the Champlin Police Department received a complaint about a loud party at 206 Elm Creek Road. Deposition of Allen Bruns at 10. Champlin Police Officers Jolene Sander and Robert L. Penney,[1] Sergeant Allen Bruns, and Reserve Officer Chris Nozzarella were dispatched to the call. *Id.*[2] Officer Sander had responsibility for the call. *Id.* Sander approached the residence and asked to speak with the homeowner. Deposition of Jolene Sander at 10. Officer Sander told Greiner and Wulff, the homeowners, to either keep the noise level down or close down the party. Deposition of Mona B. Wulff at 55. Sander also advised Wulff and Greiner that if the officers had to return, they would issue citations and close down the party. *Id.* The officers then left the residence. *Id.* at 57. The majority of guests decided to leave the party at this point. Greiner Dep. at 60–61. The stereo was also turned off. *Id.* at 60.

Approximately thirty minutes later, the Champlin Police Department received a second complaint about a loud party at 206 Elm Creek Road. Bruns Dep. at 19–20.[3] Officer Sander arrived first and waited about a minute for the other officers to arrive, during which time she "heard the violation occurring." Sander Dep. at 12. When Officer Penney and Sergeant Bruns arrived, along with Reserve Officer Nozzarella, they joined Sander and approached the residence. As they approached, the officers heard loud voices and other noises. *Id.* at 12, 16. Greiner saw the officers approaching and met them in front of the attached garage. Greiner Dep. at 70. A group of other women

also went into the garage. Sander approached the garage and shined a flashlight at plaintiff Robin A. Barbeau. Deposition of Robin A. Barbeau at 73. Barbeau claims that Sander shined the flashlight in her eyes and she asked Sander to please not do that. *Id.* Officer Sander claims she shined the flashlight into Barbeau's stomach, but Barbeau nevertheless used profanity in telling Sander to get the flashlight out of her face. Sander Dep. at 12. Barbeau claims after she protested, Officer Penney told her to "shut up bitch." Barbeau Dep. at 75.

At this point, Officer Sander told Barbeau to go into the backyard because she wanted to speak with Greiner and Wulff, the homeowners, alone. Greiner Dep. at 74. Greiner protested and said that Barbeau was her guest and had a right to stay there. *Id.* at 77. Another officer attempted to escort Barbeau to the backyard and, although she continued to protest, Barbeau eventually complied. *Id.* at 78–79. When she reached the backyard, Barbeau informed three people remaining that there was going to be a problem and they should get up front. Barbeau Dep. at 79–80. Most people moved into the garage at that point. Greiner Dep. at 87. Officer Sander informed Wulff and Greiner she would be issuing citations for violation of the public nuisance statute. Sander Dep. at 16. At that point, plaintiffs admit that at least one person, plaintiff Joanne E. Hyatt, started yelling profanities at the officers, insisting they were trespassing. Greiner Dep. at 97. Sander claims several women used profanity. Sander Dep. at 16. The officers informed everyone that the party was over and ordered everyone to leave. Wulff Dep. at 92. No one complied. *Id.* at 94. Greiner told the officers that she had invited any guests

---

1. Officer Penney was hired by the Champlin Police Department in July 1990. Deposition of Robert L. Penney at 38. Plaintiffs rely on Officer Penney's career history as circumstantial evidence that constitutional violations took place in this case. Officer Penney was fired by the St. Louis Park, Minnesota Police Department in April 1989 after the City of St. Louis Park settled a lawsuit against the city and Officer Penney for $150,000. Affidavit of Robert A. Hill Ex. 10; Penney Dep. at 22–31.

2. Sander, Penney, and Bruns are all defendants. Nozzarella is not a defendant.

3. Plaintiffs contend that the same neighbor, Bonnie Nevin, phoned in both complaints. Plaintiffs contend that Nevin had repeatedly been calling the police claiming that Wulff and Greiner were making too much noise. Greiner Dep. at 136. Plaintiffs assert that each previous time the police determined that plaintiffs were not being too loud. *Id.* at 137–38. Plaintiffs have offered the affidavits of three other neighbors. All three state that the July 13 party was not too loud and did not disturb them. Affidavit of Susan Kay Horger; Affidavit of Susan Diane Sutton; Affidavit of Kathleen Ann Winter.

who felt they had too much to drink to stay overnight. Greiner Dep. at 94. At least two or three others joined in, insisting they were not going to leave because they had been invited to stay overnight. *Id.* at 99.

The officers refused to let anyone go into the house, despite protests from some guests that they had personal belongings in the house and needed to use the bathroom. *Id.* at 98–100. Barbeau admits advising everyone at that point to ignore the officers and to go into the house because the police would then be powerless. Barbeau Dep. at 86. Several people eventually went into the house, but there is some dispute about the circumstances. Defendants provide the following version of events. Defendants claim that after Barbeau told everyone to go into the house several people, including Barbeau and plaintiff Shelly M. Ott, "bolted" for the door and made it inside. Bruns Dep. at 35. Defendants assert that they considered Ott and Barbeau under arrest at that point. *Id.* Sergeant Bruns went over to the door and put his foot in it to prevent those inside from closing the door. *Id.* at 36. Ott struggled with the door attempting to pull it shut. *Id.* at 48. At that point, Sergeant Bruns decided to go into the house to make arrests and Officer Penney followed. *Id.* at 50.

Plaintiffs offer conflicting versions of events. Greiner asserts that the officers gave some people permission to go into the house, including Ott and Barbeau. Greiner Dep. at 105. Greiner also claims Ott announced before she was allowed in the house that she intended to stay all night. *Id.* at 107. Ott testified that she and Barbeau walked into the house and, although they did not have explicit permission to do so, the officers did not attempt to stop them either. Deposition of Shelly M. Ott at 126. Barbeau testified that she and Ott did not have permission to go into the house but instead ignored the officers' order to stay outside and ran into the house before the officers could stop them. Barbeau Dep. at 92–94. There does not appear to be any dispute that in the meantime Hyatt and Officer Penney were arguing and Penney was demanding that Hyatt leave immediately. Deposition of Joanne E. Hyatt at 44–45. Hyatt then an-

nounced that she was going into the house and she intended to stay the night. *Id.* at 45. When Hyatt attempted to go into the house, Officer Penney physically restrained her. Deposition of Robert L. Penney at 81. Hyatt claims that Penney put her into a choke-hold. Hyatt Dep. at 49. Using profanity, Hyatt demanded that Penney take his hands off her. *Id.* at 50. Hyatt claims that three officers then pulled her from the door and dragged her across the garage. Hyatt claims Officer Penney kneeled on her head while she was on the ground. *Id.* at 55. Officers Sander and Penney then handcuffed Hyatt. Sander Dep. at 24. Plaintiffs claim that Ott, who was inside at the time, became upset and attempted to go out into the garage but was blocked from the inside by Barbeau and plaintiff Kimberly Jo Salo, along with Sergeant Bruns who was standing in front of the door. Greiner Dep. at 111. Plaintiffs claim that at that point Sergeant Bruns announced that the officers were going to go inside. *Id.* at 112. Bruns, Penney, and Sander then pushed the door to the house open. *Id.* at 112–13.

There is little dispute as to what occurred after the officers were inside. Officer Sander instructed two women at the top of the steps to sit on the couch. They complied and were not arrested. Sander Dep. at 35. Officer Penney placed handcuffs on Ott. Penney Dep. at 127. During the handcuffing, Ott's shirt was pulled above her head and Penney refused to pull it back down. Penney claims he did not pull the shirt back down because she was struggling. *Id.* at 108. Plaintiffs admit Ott was resisting arrest. Barbeau Dep. at 101. Sergeant Bruns, in the meantime, arrested and handcuffed Barbeau. *Id.* Officer Sander then conducted a protective sweep of the house. Sander Dep. at 36.

Salo followed Barbeau and Ott as they were led out of the house. Deposition of Kimberly Jo Salo at 32. Salo approached Barbeau and asked her what she should do. *Id.* at 33. There is some dispute about what happened next. Salo claims that Officer Sander grabbed her, pushed her into the corner of the garage, and told her to stay there. *Id.* Salo did not obey, claiming she wanted to look at Barbeau's finger, which

had been injured in the process of being handcuffed. *Id.* at 37. Salo claims Sander then grabbed her, threw her to the ground, put a knee in the back of her head and put handcuffs on her. *Id.* at 38. Officer Sander disputes Salo's account. Sander claims that she ordered Salo to stay outside the garage and not interfere but that Salo kept coming into the garage on Sander's gun side. Sander Dep. at 38. Sander asserts that she arrested Salo only after Salo approached a third time. *Id.* at 45. Sander claims she never threw Salo to the ground. *Id.* at 48.

Greiner then entered the house to check for damage and was arrested inside the house. Greiner Dep. at 122. Wulff was arrested and handcuffed in the garage. *Id.* Plaintiffs were all escorted to the police cars. When they reached the police cars, Officer Penney conducted a pat-down search of Greiner. *Id.* at 124. Greiner alleges that during the search Penney "grabbed" her in the groin in an "inappropriate fashion." *Id.* at 125. Greiner states that once she was put in the car, she heard Officer Sander announce she was going to go back in to search the house. *Id.* at 126. Greiner claims to have observed Sander enter the house and could see her flashlight as she went from room to room. *Id.* Defendants deny that a second search of the house ever took place. Defs.' Mem.Opp. to Pl.'s Mot. Partial Summ.J. at 10–11.

Everyone who was arrested is a plaintiff in this case.[4] Plaintiffs were charged with public nuisance, disorderly conduct, and obstructing legal process. At the jail, paramedics examined Barbeau's finger and Ott's neck and shoulder. Barbeau Dep. at 117. Ott was given the option to go to the hospital, but declined. Ott Dep. at 86–87.

All plaintiffs claim that the incident has resulted in psychological trauma. Hyatt claims she sustained a whiplash injury to her neck as a result of the arrest. Hyatt Dep. at 95. Barbeau alleges she sustained a finger injury. Barbeau Dep. at 29. Wulff, Greiner, Ott, and Salo do not claim any physical injuries.

Champlin Police Chief Gene H. Kulander first became aware of this incident three days later, July 16, 1991, from his review of the police reports and from a call from the city administrator. Deposition of Gene H. Kulander at 5. Chief Kulander contacted Greiner and asked her if she wanted to file a complaint with regard to the conduct of the officers. *Id.* at 6. Greiner did not file a complaint. Kulander reviewed the police reports and concluded that no civil rights violations had occurred. *Id.* at 7. The department did not conduct any internal affairs investigation. *Id.* at 8. All charges against the plaintiffs were eventually dropped.

On October 3, 1991, plaintiffs filed a civil suit making the following claims: (1) federal constitutional and statutory violations; (2) state constitutional violations; (3) state human rights violations; (4) trespass; (5) assault; (6) battery; (7) false arrest; (8) negligence; and (9) intentional infliction of emotional distress. Defendants seek summary judgment on all claims by all plaintiffs. Greiner seeks summary judgment on her claims for warrantless arrest and unreasonable search and seizure.

## DISCUSSION

### I. *Summary Judgment Standard*

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leas-*

---

4. Not everyone who remained at the party was arrested.

*ing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## II. *Defendants' Motion for Summary Judgment*

### A. Section 1983 Claims

#### 1. *Qualified Immunity*

 All defendants, except the City of Champlin, argue that they are entitled to qualified immunity for all of plaintiffs' section 1983 claims alleging constitutional violations.[5] Immunity is a threshold issue that should be resolved before addressing the merits of a claim. *Alberts v. City of New York,* 549 F.Supp. 227, 230 (S.D.N.Y.1982). A law enforcement officer is shielded by qualified immunity from civil liability if the officer did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989). The test for qualified immunity is an objective one. *Harlow,* 457 U.S. at 817–20, 102 S.Ct. at 2738–39. Whether an officer's conduct was objectively reasonable is a question of law that should be determined by the Court at the earliest possible stage of litigation. *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d

523 (1987); *see also Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

#### a. Freedom of Assembly and Association

 Plaintiffs argue that the officers violated plaintiffs' constitutional rights to freedom of assembly and association by ordering the guests to leave the party. Moreover, plaintiffs argue that because a reasonable officer would have known that the orders to leave the party violated clearly established constitutional rights, qualified immunity is not available. Because plaintiffs' section 1983 claims depend in large part upon the Court making such a finding, the Court will discuss this issue first.

The Supreme Court has held that the freedom of association has two distinct senses. *Roberts v. United States Jaycees,* 468 U.S. 609, 616, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). In one line of decisions, the Supreme Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id.* In a second line of decisions, the Supreme Court has held that choices to enter into and maintain certain intimate human relationships must be secured against undue government intrusion. *Id.* "The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family." *Id.* at 619, 104 S.Ct. at 3250. Conversely, associations lacking in deep attachments and commitments are not entitled to constitutional protection. *Id.* at 618–21, 104 S.Ct. at 3250–51. "Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful

---

**5.** Qualified immunity is not available to municipalities. *Owen v. City of Independence,* 445 U.S.

622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* at 620, 104 S.Ct. at 3251.

Plaintiffs contend that the right to invite friends to stay overnight is protected by the freedom of assembly and association, and no reasonable officer would conclude otherwise. Plaintiffs offer the affidavit of a former police officer to support this assertion. Affidavit of Russell J. Krueger ¶ 4. Defendants assert that there is no constitutional right to stay at someone else's home after the police have received two complaints in the middle of the night about noise. Defendants offer an affidavit of their own expert in which he concludes that all of defendants' actions were reasonable under the circumstances. Affidavit of Donald S. Peterson.

The Court finds that there is no clearly established constitutional right to invite guests to stay overnight. In fact, plaintiffs do not cite a single case finding such a right but rather ask the Court to recognize such a right for the first time in this case. Under the circumstances of this case, the Court declines to recognize such a right. Greiner's and Wulff's relationships with the guests lie somewhere on the spectrum between the "most intimate to the most attenuated." *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3251. *See also Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 243–44 (6th Cir.1990) (private drinking club with some recreational activities did not rise to level of intimate association or political association so no freedom of association protection); *McKenna v. Peekskill Housing Authority,* 497 F.Supp. 1217, 1220–23 (S.D.N.Y.1980), *aff'd in part, rev'd in part,* 647 F.2d 332 (2d Cir.1981) (rule in a public housing project that required tenants to obtain approval for overnight guests did not violate the tenants' freedom of association rights); *Smith v. Indiana State Board of Health,* 159 Ind.App. 360, 307 N.E.2d 294 (1974) (dicta doubting whether constitutional right to assemble at rock festivals). Greiner and Wulff admit that the reason for the party was because they did not know many people and they wanted to get to know some of Barbeau's friends.

Greiner Dep. at 42. Greiner and Wulff met for the first time that evening some of the people they invited to stay overnight. *Id.* at 42–46. The Court has concluded that plaintiffs' associations were lacking in deep attachments and commitments similar to familial relationships and therefore are not entitled to constitutional protection. *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250.

More important for purposes of determining whether qualified immunity applies, even if the Court were to find that Greiner and Wulff had a constitutionally protected right to invite these specific people to stay overnight, it was not a "clearly established" right of which the officers, as reasonable persons, would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Plaintiffs do not cite any case recognizing such a right. Thus, if the Court were to recognize such a right, it would be interpreting the constitutional protections for freedom of assembly and association to apply in a broader range of circumstances than courts have been willing to apply those protections in the past. *See, e.g., Watson,* 915 F.2d at 243–44; *McKenna,* 497 F.Supp. at 1220–23. Police officers are not "charged with predicting the future course of constitutional law." *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). *See also Gassner v. City of Garland, Texas,* 864 F.2d 394, 397 (5th Cir.1989) ("An officer on the beat is not expected to have and apply the knowledge of a constitutional scholar."). In short, even if the Court found that plaintiffs had a constitutional right to stay overnight, that right could not be included as part of the law defendants should have known. *Creighton v. Anderson,* 922 F.2d 443, 449 n. 5 (8th Cir.1990).

The Court will now address each specific claim made by plaintiffs.

**b. Probable Cause For Warrantless Arrest**

Defendants seek qualified immunity for plaintiffs' claims based on the warrantless arrests. When analyzing whether qualified immunity protects an officer from liability for a warrantless arrest, the issue is whether arguable probable cause existed rather than actual probable cause. *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989). "Under this stan-

dard, all public officials are protected except the 'plainly incompetent' and those who are deemed to have 'knowingly violate[d] the law.'" *Id.* (*quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). If officers of reasonable competence could disagree on whether probable cause existed, the conduct is shielded by qualified immunity. *Myers v. Morris,* 810 F.2d 1437, 1455 (8th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).

 Of the six arrests in this case, three arrests occurred inside the house and three arrests occurred outside the house. Different standards apply to warrantless arrests depending on whether they occur inside the home or outside in a public place. *Duncan v. Storie,* 869 F.2d 1100, 1102 (8th Cir.), *cert. denied,* 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989). If an individual voluntarily leaves the confines of the home, then the arrest is made in a public place. *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976). Under these circumstances, to be shielded by qualified immunity the arresting officers need only demonstrate that there was arguable probable cause for the arrest. *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 598, *reh'g denied,* 424 U.S. 979, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976). However, qualified immunity does not protect officers from liability for a warrantless arrest that occurs inside an individual's home unless the officers demonstrate the existence of arguable probable cause and arguable exigent circumstances. *Duncan,* 869 F.2d at 1102. "In determining whether exigent circumstances exist, the following criteria are considered: (1) seriousness of the alleged offense; (2) reasonable belief that the suspect is armed; (3) clear showing of probable cause to believe that the suspect committed the alleged offense; (4) strong reason to believe that the suspect is on the premises; (5) likelihood that the suspect will escape if not swiftly apprehended; and (6) entry may be made peaceably." *Id.* at 1102 n. 3.

Defendants argue that none of the arrests violated plaintiffs' clearly established constitutional rights and therefore qualified immunity applies. First, defendants assert that all plaintiffs were arrested based upon arguable probable cause. Defendants argue that after the officers ordered the party to break up, plaintiffs blatantly disregarded that order and plaintiffs then escalated the situation to the point of chaos. *See* Barbeau Dep. at 91. Defendants assert that the Court is required to take into account the information that the officers possessed at the time, which included two complaints about a loud party, a defiance of an order to disburse, and a display of hostility by some admittedly intoxicated women. *See* Barbeau Dep. at 85; Ott Dep. at 41. Defendants argue that this created arguable probable cause for the arrests.

Second, defendants argue that the arrests inside the house were constitutional.[6] Defendants argue that arguable exigent circumstances existed to arrest Ott and Barbeau in the house because the officers were in hot pursuit of the two after they disobeyed the officers orders not to go into the house. Defendants assert that they were statutorily entitled to arrest plaintiffs for misdemeanors that occurred in the officers' presence and that plaintiffs attempted to avoid those arrests by going into the house. Defendants then argue that because Greiner came into the house after the police were already inside, exigent circumstances existed for her arrest. Defendants also maintain that they were in hot pursuit of Greiner when she entered the house. Thus, defendants argue, because it would have been constitutionally permissible to arrest Greiner in her garage, she could not magically escape their authority by stepping into her house.

Finally, defendants offer the affidavit of a special agent of the Minnesota Bureau of Criminal Apprehension in which he states that he has reviewed all of the depositions in this case and, in his opinion, the conduct of the officers was reasonable in all respects. Affidavit of Donald S. Peterson.

---

**6.** Ott, Barbeau, and Greiner were arrested in the house. Wulff, Hyatt, and Salo were arrested outside.

Plaintiffs respond that qualified immunity should not protect defendants for any of the arrests, inside or outside of the house, because no reasonable police officer would have ordered invited guests, some of whom were intoxicated, to leave. Plaintiffs place great emphasis on their assertion that the officers' orders to leave were not lawful because the orders violated plaintiffs' constitutional rights to freedom of assembly and association. Thus, plaintiffs argue, a reasonable officer could only conclude that it was clearly unlawful to order the guests to leave. Finally, plaintiffs offer the affidavit of former police officer who states that no reasonable police officer would have handled the situation as the officers did. Affidavit of Russell J. Krueger ¶ 4.

■■■■■ To determine whether arguable probable cause existed for the arrests, the Court must decide whether plaintiffs were entitled to ignore the officers' orders for people to leave. The Court has already concluded that the officers' orders to disburse did not violate plaintiffs' freedom of association rights. Thus, the orders to leave were lawful and plaintiffs were not entitled to ignore them. Even if a person is not engaged in unlawful conduct, he or she may "still be properly arrested for failure to obey a valid dispersal order." *Washington Mobilization Cmte. v. Cullinane*, 566 F.2d 107, 120 n. 4 (D.C.Cir.1977). *See also Dellums v. Powell,* 566 F.2d 167, 183 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (constitutionally valid arrest can be made after orders to disperse are given and people are given a reasonable opportunity to comply). Moreover, the fact that the charges against plaintiffs were eventually dropped is of limited relevance in determining whether arguable probable cause existed

for the arrests. "The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The Court finds that plaintiffs' defiance created arguable probable cause for their arrests.

The analysis cannot stop there, however, in regard to the arrests that took place in the home. The Court must determine if arguable exigent circumstances existed for those arrests. Assuming Ott and Barbeau had a legitimate expectation of privacy once they entered the house, *see Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990),[7] the officers are still entitled to qualified immunity for those arrests, as well as the arrest of Greiner, unless the officers could not have reasonably believed that exigent circumstances existed. *Creighton v. Anderson,* 922 F.2d 443, 449 n. 5 (8th Cir. 1990). The following facts convince the Court that arguable exigent circumstances existed. At the time of the arrests, the situation was "escalating" and quickly becoming "chaotic." Barbeau Dep. at 91. The officers knew Ott and Barbeau were just inside the door when the officers decided to enter to house. *Id.* at 97. Ott was yelling at the officers through the door, *id.* at 95–96, and Ott and Barbeau were both visibly intoxicated. *Id.* at 83, 85; Ott Dep. at 41. At that point, the officers entered the house and arrested Ott and Barbeau. Greiner then stepped into the entryway of the house and was arrested. Greiner Dep. at 122. Under these circumstances, the Court finds that the Constitution did not "clearly" require the officers to obtain a warrant before arresting Ott, Barbeau, and Greiner. *See United States v. Santana,* 427 U.S. 38, 42–43, 96

7. Plaintiffs' memorandum to the Court seems to accept defendants' claim that Ott and Barbeau ran into the house to avoid arrest. Pl.'s Mem. Opp.Mot.Summ.J. at 18–19. Moreover, Barbeau's deposition testimony was that she told everyone to ignore the officers' instructions not to go into the house and that she and Ott fled into the house. Barbeau Dep. at 86, 89, 92–94. If that is the case, exigent circumstances clearly existed for Ott's and Barbeau's arrests. *United States v. Santana,* 427 U.S. 38, 43, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976) ("a suspect may not defeat an arrest which has been set in motion in

a public place ... by the expedient of escaping to a private place"); *Erickson v. Comm'r of Pub. Safety,* 1992 WL 203273 (Minn.Ct.App.1992) ("Logic dictates that, regardless of the gravity of the offense, an individual should not be able to avoid an otherwise lawful warrantless arrest merely by outracing the police officers into the individual's dwelling."). However, Ott and Greiner claim that the officers allowed Ott and Barbeau to go into the house. Greiner Dep. at 105; Ott Dep. at 126. Thus, for the purposes of this analysis, the Court assumes Ott and Barbeau had permission to enter the house.

S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976). In sum, the officers were not "plainly incompetent" in concluding that exigent circumstances existed. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, the officers are entitled to qualified immunity from civil liability for the warrantless arrests both inside and outside the home.

### c. Protective Sweep

 Defendants seek qualified immunity for the protective sweeps of the house. "A 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990). Officers are entitled to take reasonable steps to ensure their safety and probable cause or reasonable suspicion is not necessary. *Id.* However, such a protective sweep, if justified by the circumstances, may extend only to a cursory inspection of places where a person may be found. *Id.*

Greiner claims two searches of the home took place and because exigent circumstances did not exist for either search, they were both illegal. She asserts that Officer Sander conducted a brief search of the entire home immediately after Barbeau and Ott were arrested in the house. Greiner also alleges that after everyone was arrested, Officer Sander went back into the house and conducted a room-by-room search. Greiner claims to have seen Sander's flashlight through the windows as she went room to room. Greiner Dep. at 126. Greiner argues that the searches were not legitimate protective sweeps because there was no evidence of any weapons or additional persons within the house.

Defendants claim that only one protective sweep was conducted and argue that it was justified under the circumstances of the case because: (1) plaintiffs displayed aggressiveness and threatened the officers; (2) the officers had reason to believe that other guests might been attempting to avoid arrest; and (3) the protective sweep took place quickly, no evidence was seized, and the house was secured. Officer Sander testified that it was a "very abnormal situation. Ev-

eryone was aggressive towards us. I had no one to ask if there was anyone else in the house. And for our safety and the safety of the officers downstairs, I did a quick sweep to make sure that there was no one else in the house that could hurt anyone." Sander Dep. at 36. Under these circumstances, defendants argue, the protective sweep was reasonable and constitutional.

The Court finds that whether the inspection of the premises amounted to a single protective sweep or two separate sweeps is not significant. The protective sweep or sweeps did not amount to a clear constitutional violation of which a reasonable officer would have been aware. Courts have consistently recognized that precautions taken by police officers in furtherance of their safety should not be routinely second-guessed. *See, e.g., United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683, 83 L.Ed.2d 604 (1985); *United States v. Bruton,* 647 F.2d 818, 822 (8th Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). Police officers are entitled to take reasonable steps to insure their safety and probable cause or reasonable suspicion are not necessary. *Maryland v. Buie,* 494 U.S. 325, 326, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990). Thus, Greiner's argument that the sweeps were not legitimate because there was no evidence of weapons is unpersuasive. Moreover, Greiner does not claim that Sander did anything more than walk through the house. The Court finds that due to the chaotic situation that preceded the sweeps, Barbeau Dep. at 91, it was not clearly unreasonable for Officer Sander to conduct a cursory inspection of the premises. *Buie,* 494 U.S. at 326, 110 S.Ct. at 1094. Under the circumstances in this case, the Court concludes that Sander did not violate "clearly established" constitutional protections and, thus, defendants are entitled to qualified immunity from civil liability for the protective sweeps.

### d. Excessive Force Claims

 Defendants argue that qualified immunity shields them from plaintiffs' claims that excessive force was used in the arrests. Qualified immunity applies to excessive force claims to the same extent as other claims of constitutional violations. *Fitzgerald v. Pat-*

*rick,* 927 F.2d 1037, 1039 (8th Cir.1991). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Where the claim arises from an arrest, it is most properly characterized as one invoking the protections of the Fourth Amendment. *Id.* at 394, 109 S.Ct. at 1871. The test under the Fourth Amendment is whether the force used was reasonable. *Id.* The reasonableness test requires a balancing of individual and governmental interests, and its application requires careful attention to the facts and circumstances of each particular case. *Id.* at 394–97, 109 S.Ct. at 1871–72. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872.

Plaintiffs argue that the force employed by Sergeant Bruns and Officers Penney and Sander in making the arrests was not reasonable. Plaintiffs argue that it was unreasonable to pull a shirt over Ott's head, to place Barbeau's handcuffs on so tight they cut her wrists, to push Salo to the ground when she was attempting to render first aid to Barbeau's finger, and to violently handcuff Salo and Ott when they had offered no resistance. Plaintiffs argue that these are per se examples of excessive use of force, although they cite no case law to support that assertion.

Defendants argue that any injuries or damages that plaintiffs sustained in the course of their arrests were minimal and direct the Court's attention to several cases in which other courts have determined, as a matter of law, that the police did not use excessive force.

■■■■ The Court finds that, under the facts and circumstances of this case, defendants did not employ force which a reasonable officer would have known was excessive. *Graham,* 490 U.S. at 394–97, 109 S.Ct. at

1871–72. Plaintiffs admit that some of them were visibly intoxicated, Barbeau Dep. at 85; Ott Dep. at 41, that they used profanity throughout their dealings with the police, Greiner Dep. at 97; Hyatt Dep. at 35, and that at least three plaintiffs, Ott, Hyatt, and Barbeau, struggled while they were being arrested. Hyatt Dep. at 50; Barbeau Dep. at 96, 101. The Court cannot say that the officers' split-second judgments about the amount of force necessary in this situation was clearly unreasonable. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. Specifically, in regard to plaintiffs' complaints about the handcuffs, "while loosening tight handcuffs may be the most compassionate action, the failure to do so does not rise to a clearly established constitutional violation." *Hannula v. City of Lakewood,* 907 F.2d 129, 132 (10th Cir.1990). In regard to plaintiffs' complaints about Ott's shirt being pulled up over her head and Salo being pushed to the ground, those actions were taken in the context of Ott resisting arrest, Barbeau Dep. at 101, and Salo repeatedly ignoring an officer's orders not to interfere, Salo Dep. at 37. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" amounts to an unconstitutional use of force. *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). In short, the Court finds plaintiffs have not shown that the officers violated "clearly established" rules on the use of force and, therefore, defendants are entitled to qualified immunity from civil liability on those claims.

### e. Frisk or Pat–Down Search

■■■■ Greiner claims that the pat-down search Officer Penney conducted after her arrest was unconstitutional. Greiner argues that Officer Sander, a female, rather than Officer Penney should have conducted the pat-down search that included her groin area. Although Greiner's complaint states that "Penney grabbed and caressed Greiner's hips and groin area", Compl. ¶ 15, in her deposition Greiner said she was not "caressed." Greiner Dep. at 125. Instead, she said that she thought the search was "inap-

propriate." *Id.* Officer Penney states that he patted only the outside of Greiner's pockets and the search did not include the groin area. Penney Dep. at 137–38. Moreover, defendants argue that they are entitled to qualified immunity for this claim.

The Court concludes that qualified immunity shields defendants from civil liability for the pat-down search. Plaintiffs do not specifically argue that the method in which Officer Penney conducted the search gave rise to the constitutional violation, but instead implies that the fact that a male officer rather than a female officer conducted the search means a per se constitutional violation occurred. The Court disagrees. It is well settled that routine pat-down searches, even if they include the groin area, do not violate the Constitution just because an officer of the opposite gender conducts the search. *Timm v. Gunter,* 917 F.2d 1093, 1101 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991); *Grummett v. Rushen,* 779 F.2d 491, 495 (9th Cir. 1985); *Smith v. Fairman,* 678 F.2d 52 (7th Cir.1982), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983); *Bagley v. Watson,* 579 F.Supp. 1099, 1103 (D.Ore.1983). Thus, Greiner must present evidence that the search was somehow not routine. Greiner's deposition testimony states only that she felt the search was inappropriate. Greiner Dep. at 125. Such a general statement cannot satisfy plaintiffs' burden of showing that Penney violated Greiner's clearly established constitutional rights. *Watson v. Jones,* 980 F.2d 1165, 1166 (8th Cir.1992); *Roach v. Teamsters Local Union No. 688,* 595 F.2d

446, 451 (8th Cir.1979). Therefore, defendants are entitled to qualified immunity from civil liability on this claim.

#### f. Summary of Qualified Immunity

The Court concludes that qualified immunity is available for all of plaintiffs' section 1983 claims alleging federal constitutional violations.[8] The purpose of granting summary judgment under the privilege of qualified immunity is to avoid having government officers subjected to the expense of litigation. *Fitzgerald v. Patrick,* 927 F.2d 1037, 1039 (8th Cir.1991). Accordingly, immunity issues should be decided by the Court long before trial. *Hunter v. Bryant,* — U.S. —, —, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). "Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." *Scheuer v. Rhodes,* 416 U.S. 232, 242, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90 (1974). This policy choice explains why plaintiffs bear the burden of showing that defendants violated clearly established law. *Hannula v. City of Lakewood,* 907 F.2d 129, 131 (10th Cir.1990). The Court finds that plaintiffs have not met that burden. The evidence in the record requires a finding that defendants did not violate any of plaintiffs' clearly established constitutional rights of which a reasonable officer would have known. *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2738. Therefore, the Court will grant Sergeant Bruns and Officers Sander and Penney's motion for

---

8. Plaintiffs' complaints also allege that defendants violated 42 U.S.C. §§ 1981 and 1985, in addition to section 1983. The parties do not address whether qualified immunity applies to sections 1981 or 1985. *See Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 793–94 (11th Cir.1992) (finding qualified immunity does not apply to section 1985). Section 1981 prohibits racial discrimination in the making and enforcement of contracts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 175, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Claims of sex discrimination are not actionable under section 1981. *DeGraffenreid v. General Motors Assembly Div.,* 558 F.2d 480, 486 (8th Cir.1977). Section 1985 is applicable only where there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Defendants assert that because plaintiffs have not alleged specific facts suggesting any racial or class-based animus, the section 1981 and 1985 claims should be dismissed. Plaintiffs have not responded to this argument. Thus, the Court finds that plaintiffs have abandoned any claims under sections 1981 and 1985 and the Court need not decide if qualified immunity applies to those claims.

summary judgment on plaintiffs' section 1983 claims.[9]

### 2. Merits of Remaining Section 1983 Claims

The City of Champlin and Chief Kulander argue that the section 1983 claims against them should be dismissed as a matter of law. Local governmental units can be held liable under section 1983 for deprivations of federal rights. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. at 2036. A governmental entity cannot be made liable by application of the doctrine of respondeat superior or vicarious liability. *Id.* at 691–94, 98 S.Ct. at 2036–38. Liability will be imposed only if the alleged constitutional deprivation was the result of municipal "custom or policy," *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), or took place pursuant to the instructions of a final or authorized decision-maker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). In addition, the official policy must be the "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038.

Thus, a two-step analysis is necessary. *In re Scott County Master Docket*, 672 F.Supp. 1152, 1181 (D.Minn.1987), *aff'd sub nom.*, *Myers v. Scott County*, 868 F.2d 1017 (8th Cir.1989). "The first task is to identify what the governmental body's policy is. The second task is to determine whether that policy is unconstitutional." *Id.*

#### a. The Policies

Plaintiffs argue that the City of Champlin had two unconstitutional policies. First, plaintiffs assert that Chief Kulander is liable for failure to supervise an officer (*i.e.* Officer Penney) with a history of unconstitutional conduct and this failure to supervise became

a city policy. Officer Penney was hired prior to Chief Kulander's appointment, but Kulander read Penney's file. Kulander Dep. at 14. Kulander claims that the file did not indicate the reason for Penney's termination from the St. Louis Park police force. *Id.*

A failure to discipline a subordinate for unconstitutional conduct gives rise to a separate constitutional claim against the superior only if the failure to discipline is the result of a custom or policy. *Skevofilax v. Quigley*, 586 F.Supp. 532, 544 (D.N.J.1984). "A police chief who persistently fails to discipline or control subordinates in the face of knowledge of their propensity for improper use of force thereby creates an official custom or *de facto* policy actionable under § 1983." *Id.* See also *Rizzo v. Goode*, 423 U.S. 362, 375–76, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1976).

The Court finds that plaintiffs have not established that a genuine issue of material fact exists as to whether a failure to supervise Officer Penney amounted to a city policy. Plaintiffs have not offered any evidence that Chief Kulander was directly responsible for any alleged misconduct on the part of Penney. *See Rizzo*, 423 U.S. at 375–76, 96 S.Ct. at 606–07. Kulander had been Champlin's chief for only four months when the incident in question occurred. Moreover, plaintiffs have offered evidence of only a single incident of alleged misconduct while Officer Penney has been employed by the City of Champlin. Proof of a single incident of unconstitutional conduct on the part of an officer is not sufficient to impose liability on a superior or to create a city policy. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Thus, the Court holds that even if Officer Penney acted wrongfully on the night of plaintiffs' arrests, Chief Kulander was not so negligent in his supervision of Penney that it became the *de facto* policy of the city.

---

9. Chief Kulander need not rely on qualified immunity for the claims arising out of the arrest because even if the officers' conduct was wrongful, a supervisory police officer cannot be held liable on the theory of respondeat superior.

*Myers v. Morris*, 810 F.2d 1437, 1464 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). The next section addresses whether plaintiffs can state a claim against Chief Kulander for his own alleged misconduct.

■ The second policy plaintiffs claim was unconstitutional was the police department's alleged misuse of the public nuisance statute. Plaintiffs claim this alleged misuse of the statute was a city policy. Plaintiffs base this assertion on Chief Kulander's admission that in the past he had written letters to landlords threatening to charge them with a violation of the statute unless the landlords evicted certain problem tenants. Kulander Dep. at 23–28. The police targeted addresses to which officers repeatedly were called to break up loud parties. *Id.* at 27–28. Chief Kulander had the city attorney review the practice, and the city council was aware of its existence. *Id.* Defendants do not dispute that this policy existed.[10] Defendants are willing to concede that the only question is whether the policy is constitutional.

### b. Constitutionality of Policy

Plaintiffs argue that the policy of allowing the public nuisance statute to be used to break up parties has resulted in an acceptance of constitutional violations. More specifically, plaintiffs allege that their freedom of assembly and association rights have been violated. Plaintiffs argue that this "policy" establishes that the City of Champlin and Chief Kulander were the "moving force" behind deprivations of plaintiffs' constitutional rights. Defendants respond by arguing that this city policy is not unconstitutional.

■ The Court finds that a policy of breaking up loud parties after repeated complaints does not violate the Constitution. The freedom of association is principally intended to protect political gatherings and intimate human relationships such as the

family. *Roberts*, 468 U.S. at 616–21, 104 S.Ct. at 3249–51. Loud parties that result in complaints to the police do not generally fit in either of these categories. Moreover, even if social gatherings are protected by the freedom of association, the government is authorized to impose reasonable time, place, and manner restrictions. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Plaintiffs have not established an official policy that was the "moving force" behind constitutional violations. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038. In fact, plaintiffs have not established that any constitutional violations occurred. Thus, the Court will grant summary judgment in favor of Chief Kulander and the City of Champlin on plaintiffs' section 1983 claims.[11]

### B. State–Law Claims
#### 1. *Immunity for Tort Claims*

■ Defendants argue that plaintiffs' state-law claims are barred by the doctrine of official immunity. The federal doctrine of qualified immunity does not apply to claims brought under Minnesota law. *Elwood v. Rice County*, 423 N.W.2d 671, 676–77 (Minn. 1988). However, the "common law of official immunity retains an independent vitality in state tort actions." *Id.* at 677. While qualified immunity and official immunity are distinct concepts, the tests are similar. The official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Susla v. State*, 311 Minn. 166, 247 N.W.2d 907, 912 (1976). "Generally, police officers are classified as

---

**10.** Plaintiffs claim that Sander, Bruns and Penney each stated in their depositions that it is also a policy of the police department for officers to enter homes without a warrant or consent to break up parties. Plaintiffs do not cite any page numbers within the depositions. After reviewing all of the depositions, the Court could not find any admissions this broad. Sergeant Bruns testified: "Our procedure is that when there are loud parties, we go over there and advise them of the incident, tell them what will happen if we return. Upon a return, if we get another call, they will receive a citation and the party is other [sic]." Bruns Dep. at 15. Officer Sanders testified:

"[I]t's policy and past practice that when you go back a second time, a citation is issued and the party is over and everyone leaves." Sander Dep. at 78. Thus, the Court will not address whether the City had a policy of entering homes without warrants or consent.

**11.** The City of Champlin has requested a declaration that plaintiffs cannot recover punitive damages under section 1983. Because the Court will grant the City of Champlin summary judgment on the merits of plaintiffs' section 1983 claims, the Court need not address this issue.

discretionary officers entitled to that immunity." *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn.1990). The willful or malicious wrong exception anticipates liability only when the police officer intentionally commits an act that he or she has reason to believe is prohibited. *Rico v. State,* 472 N.W.2d 100, 107 (Minn.1991). If the police officers are entitled to official immunity, the City of Champlin, as the officers' employer, is also entitled to official immunity. *Pletan v. Gaines,* 494 N.W.2d 38, 43 (Minn.1992).

Defendants argue that no facts exist to show willful or malicious conduct and, accordingly, the Court should dismiss the tort claims for trespass, assault, battery, false arrest, negligence, and intentional infliction of emotional distress. Plaintiffs argue that the officers are not entitled to official immunity because there was no emergency situation, a factor they argue *Elwood* requires to be present. Moreover, plaintiffs argue, the officers acted maliciously. Thus, they assert that these claims are not barred.

 Contrary to plaintiffs' assertion, an emergency situation is not necessary for official immunity to apply. In *Elwood,* the court merely noted that police often face emergency situations. 423 N.W.2d at 678. Courts have found official immunity to apply in non-emergency situations. *See, e.g., Rico v. State,* 472 N.W.2d 100 (Minn.1991) (termination of employee covered by official immunity). Thus, the Court finds that the only issue presented by plaintiffs is whether the officers acted maliciously. In order to be malicious, the conduct must be a "willful violation of a known right." *Rico,* 472 N.W.2d at 107. "The exception does not impose liability merely because an official *intentionally* commits an act that a court or jury subsequently determines is wrong." *Id.* Plaintiffs have offered no more than a conclusory statement that defendants acted mali-

ciously. Conclusory allegations do not raise a genuine issue of material fact. *Kypke v. Burlington Northern Railroad Co.,* 928 F.2d 285, 287 (8th Cir.1991). Thus, because plaintiffs do not point to specific facts indicating that defendants maliciously engaged in tortious conduct, the Court finds that defendants are entitled to official immunity for the tort claims.[12]

### 2. Minnesota Human Rights Act Claims

 Plaintiffs allege that defendants violated Minn.Stat. § 363.03, Subd. 4 of the Minnesota Human Rights Act, which forbids gender-related discriminatory practices in the area of public services.[13] Under this statute, plaintiffs must first establish a prima facie case. *Anderson v. Hunter, Keith, Marshall, & Co., Inc.,* 417 N.W.2d 619, 623 (Minn. 1988). A plaintiff can establish a prima facie case under the statute in two ways: (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of a difference in gender; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation. *City of Minneapolis v. Richardson,* 307 Minn. 80, 239 N.W.2d 197, 202 (1976). If plaintiffs establish a prima facie case, the burden of production shifts to the defendants to produce legitimate nondiscriminatory reasons for plaintiffs' treatment. *Anderson,* 417 N.W.2d at 623–24. If defendants produce legitimate reasons, plaintiffs are entitled to offer evidence that the asserted reasons are pretextual. *Id.* At all times, however, the ultimate burden of persuasion rests on the plaintiffs. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 n. 2 (Minn.1986) (citing *Texas Dept. of Community Affairs v. Burdine,*

---

12. City of Champlin argues that it is entitled to sovereign immunity as well. Plaintiffs' memorandum does not respond to that argument. Accordingly, the Court will not engage in an extensive analysis but does find that, in addition to official immunity, the city is entitled to sovereign immunity for any claim that the city failed to properly train or supervise its employees. Minn. Stat. § 466.03, Subd. 6. *See also Holmquist v. State,* 425 N.W.2d 230, 231 (Minn.1988).

13. Plaintiffs' complaints also allege a violation of Minn.Stat. 363.03, Subd. 6, which prohibits aiding and abetting discriminatory practices. Plaintiffs' memorandums for this motion do not address Subd. 6. Thus, the Court finds plaintiffs have abandoned this aspect of their claim.

450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

Defendants argue that the Court should dismiss these claims because plaintiffs have offered only bald assertions of gender discrimination. Plaintiffs respond that there is ample evidence that defendants' actions were motivated by gender, but offer only one example. Plaintiffs argue that Officer Penney's actions when he pulled Ott's shirt over her head were based on gender because he sought to humiliate Ott by exposing her breasts. Plaintiffs argue that the pulling of Ott's shirt over her head humiliated not only Ott, but the other plaintiffs as well.

The Court finds that plaintiffs have not established a *prima facie* case of gender discrimination. *See, e.g., Sigurdson v. Isanti County,* 408 N.W.2d 654, 659 (Minn.Ct.App. 1987). Plaintiffs do not argue that in similar situations men are treated differently. Thus, plaintiffs must meet their burden by establishing that their treatment was so at variance with what would be expected under the circumstances that gender discrimination is the probable explanation. *Richardson,* 239 N.W.2d at 202. The Court concludes that no reasonable juror could find that plaintiffs had established this fact. The officers' actions in general and the ultimate decision to arrest plaintiffs were more likely the result of plaintiffs' admitted defiance and belligerence than the result of gender discrimination. *See McKee v. City of Rockwall, Texas,* 877 F.2d 409, 416 (5th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990) (reversing district court's refusal to grant summary judgment for defendant police officer because plaintiff failed to provide sufficient evidence that officer's actions were the result of gender discrimination). *Cf. City of Minneapolis v. Buschette,* 307 Minn. 60, 240 N.W.2d 500 (1976) (insufficient evidence that gender-neutral provision was selectively enforced in bad faith against women). More specifically, in regard to plaintiffs' argument that the officers discriminated against all plaintiffs based on the officers' treatment of Ott, it is important to note that Ott's shirt was pulled up while she was resisting arrest. Barbeau Dep. at 101. The most probable explanation of the officers' conduct under these circumstances is that they believed they were taking a reasonable step to ensure their safety while making the arrest, *Maryland v. Buie,* 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990), and whether a suspect is resisting arrest is directly relevant to an officer's split-second judgment as to what actions are necessary to protect officer safety. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1081 (8th Cir.1990). In short, the Court holds that no reasonable juror could conclude that gender discrimination was the most probable explanation of the officers' actions. Thus, because plaintiffs have not offered sufficient evidence to establish a *prima facie* showing of gender discrimination, the Court will grant defendants summary judgment on plaintiffs' claims alleging violations of the Minnesota Human Rights Act.

### III. *Plaintiff Greiner's Motion for Partial Summary Judgment*

Greiner's complaint alleges ten separate causes of action. Greiner seeks summary judgment on counts 1 and 10. Count 1 alleges federal constitutional and statutory violations. Count 10 alleges an unreasonable search. Greiner seeks summary judgment on these claims based on her contention that both her warrantless arrest inside the house and the subsequent protective sweeps violated her Fourth Amendment rights. The Court has already held that defendants are entitled to summary judgment on these claims on the grounds of qualified immunity. Therefore, Greiner's motion for partial summary judgment will be denied.

Accordingly, based on the foregoing and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. defendants' motion for summary judgment is granted;

2. plaintiff Greiner's motion for partial summary judgment is denied.

LET JUDGMENT BE ENTERED AC-
CORDINGLY.