Ivory WATSON and Calley Watson, in Their Individual Capacity and as Representative Members of a Class Similarly Affected, Plaintiffs–Appellants,

v.

FRATERNAL ORDER OF EAGLES, Fraternal Order of Eagles Grand Aerie, and John Doe, in His Individual and Official Capacity as a Member of the Fraternal Order of Eagles and International Fraternal Order of Eagles, Defendants–Appellees.

No. 89–3272.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 13, 1989.

Decided Oct. 1, 1990.

---

236

Edward L. Gilbert, argued, Akron, Ohio, for plaintiffs-appellants.

Kevin T. Lyden, James L. Bickett, argued, Joondeph & Shaffer, Akron, Mell G. Underwood, Jr., argued, New Lexington, Ohio, for defendants-appellees.

Before MERRITT, Chief Judge, KENNEDY, Circuit Judge, and McRAE, Senior District Judge.[*]

MERRITT, Chief Judge.

Plaintiffs appeal summary judgment in favor of the defendants in this action alleging race discrimination in the refusal to form a contract, a violation of 42 U.S.C. § 1981 (1982). Plaintiffs Calley and Ivory Watson, mother and son, are black. They sued Akron Aerie Local 555 of the Fraternal Order of Eagles (hereinafter Local 555) and its parent, the International Fraternal Order of Eagles Grand Aerie (hereinafter Grand Aerie) under 42 U.S.C. § 1981 and for discrimination in public accommodations under Title II of the 1964 Civil Rights Act, 42 U.S.C. § 2000a et seq. (1982).[1] They also appended state claims for breach of contract and intentional infliction of emotional distress. The District Court denied relief on the federal claims because it found that Title II's private club exception, 42 U.S.C. § 2000a(e), barred any relief under any civil rights statute; it also dismissed the pendent state claims. Because we hold that § 2000a(e) does not foreclose this independent action under § 1981, we reverse the judgment of the District Court but we affirm with respect to the Grand Aerie because plaintiffs have not stated a cause of action against them under § 1981.

## I. BACKGROUND

"At the outset, it is important to make clear precisely what this case does *not* involve." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968). At issue in this case is not whether the Eagles as a whole or Local 555 individually are discriminatory organizations. Whether Local 555 admits blacks as members or guests as a general rule is also not before us. Nor must we determine the extent to which the law generally permits the existence of discriminatory clubs. What is at issue in this case is solely whether the plaintiffs have alleged sufficient facts with adequate support to state a cause of action for refusal to contract under § 1981 and to survive a motion for summary judgment.

Local 555 is a constituent of the Fraternal Order of Eagles. The Order is organized into local lodges called "aeries," a word used for the mountain-top nests of hawks, eagles, and other birds. It has an overall governing body called the "Grand Aerie." The Grand Aerie sets international policies for the Eagles and its component local aeries, but the Grand Aerie leaves membership policies and house rules up to the local aeries, according to the constitution and bylaws of the Grand Aerie. Fraternal Order of Eagles Const. art. VII, §§ 6, 8, J.A. at 223–24. The locals own their own halls. Under its stated rules, Local 555 uses a blackball system for membership: The members vote on a candidate using white or black balls, and if the candidate receives more than three black balls, he is not admitted. Local 555's secretary testified that the Local had about 700 members at the time of the incident, that some whites had been rejected for membership, and that no blacks were members of Local 555 or had tried to become members. Deposition of Louis Trunzo at 7–8, J.A. at 167–68; Affidavit of Louis Trunzo ¶ 20, J.A. at 50. The members of Local 555 have no responsibility for club policies. Memorandum in Support of Defendants' Motion for Protective Order, Docket No. 24.

The Eagles, like other fraternal organizations, is an all-male club designed to organize social events, recreation, and charitable activities for its members, their children, and members of the "Ladies Auxiliary." The purposes of the club itself are not specified in the record. Counsel for Local 555 said at argument on the summary judgment motions that the club served no food

---

[*] The Honorable Robert M. McRae, Senior Judge of the United States District Court for the Western District of Tennessee, sitting by designation.

[1] In addition, the Watsons also sued the Director of the Ohio Department of Liquor Control under 42 U.S.C. § 1983 (1982). Plaintiffs' counsel represented to the Court at oral argument that the § 1983 claim against the Director has been voluntarily dismissed.

[e]xcept on Friday nights when they have their fish-fry. They don't serve lunches and dinners and things like that. It's a bar. Don't serve coffee—just to get potted.

Transcript of Motion Hearing, Docket No. 100, at 21. When the District Court asked, "What do the Eagles do besides drink liquor?" counsel responded:

Socialize and ... if they have money left over they give it to charitable organization [sic] in the community. It's just a fraternal organization, people get together and socialize and they have dances Saturday nights for the members and guests.

*Id.* at 24. While the Eagles as an organization has existed since the close of the nineteenth century, the record reveals little more about its original purpose or present day activities.

The Local 555 hall in Akron has three rooms: a banquet room, a social room, and a game room. Local 555 rents out the banquet room for private parties held by nonmembers. Affidavit of Louis Trunzo ¶ 24, J.A. at 50. The social room has a bar that serves alcoholic and nonalcoholic beverages. Local 555 permits members to bring as many guests to the hall at one time as they would like. Once a guest has visited three times, he is not permitted in the hall unless he becomes a member. According to the stated house rules, which the Watsons claim are not observed, a member must accompany any guest into the social room and purchase any alcoholic beverages for the guest; guest may purchase their own soft drinks for cash. Deposition of Louis Trunzo at 10, J.A. at 170. Local 555 has this policy to conform to the requirements of its liquor license, which limits sales of alcohol to members only. *Id.*

In November 1987, the Watsons received an invitation to attend a party at the Local 555 hall. The guests of honor were Tom and Cheri Huskey, whom Ivory Watson had met through a youth baseball league. After winning the lottery, the Huskeys moved to California from Akron, and for Thanksgiving that year they had decided to come back to visit their old friends. Looking for a place large enough to hold all of the invited guests, one of the Huskeys' friends, B.Y.,[2] suggested the Local 555 hall. B.Y. was a member of the Local 555 Ladies Auxiliary and could invite an unlimited number of guests to the hall. Mr. Huskey had been a member of Local 555 before he moved to California. He and his wife sent out postcards to their friends, including the Watsons. B.Y. did not limit the number or review the identity of any of the guests.

On the day of the party, the Watsons went to the Local 555 hall, rang a doorbell, and were admitted by a buzzer system, apparently sight unseen. Most of the twenty-odd party guests and the Huskeys had already arrived, and the party spread between the banquet room and the social room. Despite Local 555's stated rules to the contrary, some of the guests had purchased drinks at the bar; no one was required to prove membership in Local 555, or the Eagles, generally to buy a drink. Guests moved freely around the facility. B.Y. was working at the bar. The Watsons were the only blacks at the party.

The Watsons and defendants offer very different versions of what happened next. Because the Watsons lost on summary judgment, we will accept the facts as they aver them.

The Watsons claim that B.Y. approached Mrs. Huskey privately and told her that blacks were not welcome at the Local 555 hall. Mrs. Huskey started suggesting that people leave and go elsewhere. She then told her husband to talk to B.Y. Affidavit of Cheri Huskey ¶¶ 6–7, J.A. at 160. B.Y. told Mr. Huskey in a side room that the Watsons would have to go because the Eagles had a rule against blacks and the Local 555 liquor license required it to enforce all rules. B.Y. said she had talked to a Local 555 trustee and that he told her to expel the Watsons even though they were

---

**2.** Some of the witnesses in this case have requested anonymity. The District Court filed a protective order with the agreement of the parties, Docket No. 25, and we will refer to the witnesses as the District Court did, using their initials.

causing no problems. She also said that the bartender who was relieving her indicated that she would not serve the Watsons. Affidavit of Tom Huskey ¶ 7, J.A. at 156.

Meanwhile, Ivory Watson had gone to the bar to purchase soft drinks for his mother and himself. Another guest, Mr. Kistler, offered to buy the drinks for Mr. Watson. Before Mr. Kistler could complete the purchase, Mr. Huskey interfered and told the guests at the bar that the party was leaving because no blacks were allowed in the Local 555 hall. Mrs. Huskey informed the other guests, and everyone in the party decided to adjourn to Guy's Party Center, a bar down the road from the Local 555 hall. B.Y. promised the Huskeys that she would direct any late guests to Guy's. At about 9:00 p.m., the Watsons left Guy's. B.Y. later joined the group at Guy's, which then decided to return to the Local 555 hall where the drinks were cheaper and the facilities better. The party continued in the game room of the Local 555 hall, where it had not been earlier. Mr. Huskey says that he went freely through the hall, bought drinks at the bar, and used the men's restroom, all unimpeded. The Eagles were holding a dance that night for members and guests, and the Huskey party apparently joined the dance.

The defendants claim that the incident began because C.H., a member of Local 555 who was sitting at the bar at the time, began to make racist comments upon seeing the Watsons. B.Y. and her coworker refused to serve him any more alcohol and told him to stop, but he did not. Fearing that the situation would become explosive, B.Y. called a trustee who told her to tell "them" to leave. Affidavit of B.Y., J.A. at 53. B.Y. told Mr. Huskey to tell the Watsons to leave; the offending member left soon afterwards. In response to this story, the Watsons assert that they heard no racist remarks from anyone at the bar that evening. The Watsons attempted to depose C.H. on a number of occasions, and

eventually moved the District Court to order C.H. to appear and show cause why he should not be held in contempt. The District Court held this decision in abeyance because it faced several motions for summary judgment.[3]

All of the defendants moved for summary judgment individually. In a single opinion and order, the District Court dismissed all claims against all of them. First, the District Court dismissed the two federal claims against the Grand Aerie and Local 555. It found that both the Grand Aerie and Local 555 were covered by the private club exception to the Civil Rights Act of 1964, 42 U.S.C. § 2000a(e) (1982). The District Court found that the defendants had introduced enough evidence to show that they were private clubs and that the Watsons did not introduce opposing evidence to create a genuine issue of material fact. Next, the District Court held that 42 U.S.C. § 1981 implicitly contained the § 2000a(e) exemption for private clubs. The court decided that § 1981 could not extend beyond the relief offered by the later and more specific Title II, and that a literal application of § 1981 to all contractual relations of private clubs would infringe on the members' First Amendment right of free association.

## II. THE EFFECT OF TITLE II ON SECTION 1981

When Congress enacted the 1964 Civil Rights Act, the question arose whether it intended to affect the earlier civil rights acts then in force. The Supreme Court has answered this question several times, and has found that the limitations found in the later civil rights statutes do not impinge on actions that may be brought under earlier enactments. While the Supreme Court has specifically reserved the issue presented to us, *Runyon v. McCrary,* 427 U.S. 160, 172 n. 10, 96 S.Ct. 2586, 2595 n. 10, 49 L.Ed.2d 415 (1976) (private school not a private club); *Tillman v. Wheaton–Haven Recrea-*

---

**3.** At oral argument, plaintiffs' counsel represented to the District Court that he had finally deposed C.H., and that C.H. testified that he did not recall making any racist remarks. Tran-script of Motion Hearing, Docket No. 100, at 38. Pursuant to the protective order, C.H.'s deposition has not been filed with the District Court.

*tion Ass'n*, 410 U.S. 431, 438–39, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973) (association clearly not private club, so Court does not decide whether immune under § 2000a(e)), the Court has repeatedly held that the later statutes did not repeal the earlier statutes. For example, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Supreme Court specifically held that 42 U.S.C. § 1982 (1982) provides a separate remedy for housing discrimination from the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1982). Similarly, the Supreme Court has held that a § 1982 claim was not subject to the administrative requirements of the 1964 Civil Rights Act because the two acts provided for separate forms of recovery. *Sullivan v. Little Hunting Park*, 396 U.S. 229, 237–38, 90 S.Ct. 400, 404–05, 24 L.Ed.2d 386 (1969). The Court has also held that, under many circumstances, Title VII of the 1964 Act and § 1981 create two separate actions, are subject to different procedures, create different remedies, and that both statutes might apply to a given situation. *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 2375, 105 L.Ed.2d 132 (1989); *Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Thus, although the Supreme Court has not answered the precise question before us, its other precedents indicate a clear path to us.

As a general rule, later, more specific statutes limit the interpretation of earlier, more general ones. 2A N. Singer, *Sutherland Statutes and Statutory Construction* § 51.05, at 499 (Sands 4th ed. 1984). This principle does not apply if the legislature intended the general act to retain independent force. *Id.; see also id.* § 51.01, at 449 ("[O]ther statutes may not be resorted to if the statute [to be interpreted] is clear and unambiguous."). Strong evidence exists to support the proposition that Congress did not intend to vitiate other possible remedies for discrimination when it enacted Title II. First, Congress included an express "savings clause" in the statute. That section provides that "nothing in this subchapter shall preclude any individual ... from asserting any right based on any other Federal or State law not inconsistent with this subchapter ... or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right." 42 U.S.C. § 2000a-6(b) (1982). Applying § 1981 to refusals to contract by private clubs is not inconsistent with Title II. Section 2000a(e) is merely definitional. Section 2000a(a) prohibits discrimination in "public accommodations." As the provisions of § 2000a(b) include specific types of institutions in the set of "public accommodations," § 2000a(e) excludes one type of institution, the private club, from that set of institutions subject to the enforcement provisions of Title II. The reason for this particular exclusion is that private clubs often resemble places of public accommodation by serving food and drink and providing entertainment for their guests. The exception does not, however, give the clubs *carte blanche* to violate all other antidiscrimination laws. Rather, it only exempts them from the particular provisions of Title II, *e.g.* suits against them by the Attorney General under 42 U.S.C. § 2000a-5(a). Thus, although Title II does not apply to all establishments, suits against noncovered establishments under other statutes are not inconsistent with Title II. A department store, for example, is not directly covered by Title II but would be amenable to suit under § 1981. Similarly, even though private schools do not fall under the provisions of Title II, a suit against them under § 1981 is not inconsistent with Title II. *Runyon v. McCrary*, 427 U.S. at 172 n. 10, 96 S.Ct. at 2595 n. 10. A state law prohibiting discrimination in private clubs would create a state cause of action not inconsistent with Title II.

Second, Congress has also indicated its intention to preserve both statutes by not amending either one after the Supreme Court held that § 1981 applies to private discrimination in *Runyon v. McCrary*. Further, the legislative history considered by the Court in *Runyon* suggests that Congress purposely left both statutes in force. *Runyon*, 427 U.S. at 174 n. 11, 96

S.Ct. at 2596 n. 11 (effort to make Title VII and Equal Pay Act exclusive remedies for employment discrimination fails) (citing 112 Cong.Rec. 3371–73 (1972)). Thus, Congress expressly and implicitly contemplates the two acts existing side by side controlling in their respective areas despite the overlap between the two.

This intention is revealed also in the structure and application of the two statutes. Because they are different statutes, Title II and § 1981 have different requirements for bringing a cause of action, for standing, and for obtaining relief. Under Title II, a plaintiff must pursue certain administrative remedies before suing the allegedly discriminating party. 42 U.S.C. § 2000a–3(c), (d) (1982). A plaintiff may sue under § 1981 without seeking any administrative relief. The Attorney General may sue under Title II, 42 U.S.C. § 2000a–5(a), and may request the convening of a three-judge court. 42 U.S.C. § 2000a–5(b). The Attorney General has no explicit or implicit right to sue under § 1981. *See United States v. City of Philadelphia,* 644 F.2d 187 (3d Cir.1980) (no implied right of action for United States under § 1981). Finally, a plaintiff suing under the 1964 Civil Rights Act need not prove that the defendant's actions were intentional, but a plaintiff suing under § 1981 must. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 383 n. 8, 383–91, 102 S.Ct. 3141, 3146–50 n. 8, 73 L.Ed.2d 835 (1982).

The two statutes also offer different remedies. Title II only permits the issuance of an injunction and declaratory relief. *Newman v. Piggie Park Enters.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam); 42 U.S.C. § 2000a–3(a) (1982). Section 1981 permits a plaintiff to seek compensatory and punitive damages as well as injunctive and declaratory relief. *Johnson v. Railway Express Agency,* 421 U.S. at 460, 95 S.Ct. at 1720 ("An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages.").

Finally, the respective constitutional bases for each of the two statutes differ. Congress enacted § 1981 pursuant to the Thirteenth Amendment. *Runyon v. McCrary,* 427 U.S. at 168–74, 96 S.Ct. at 2593–96; *see also Jones v. Alfred H. Mayer Co.,* 392 U.S. at 422–37, 88 S.Ct. at 2194–2202 (reviewing history of 1866 Civil Rights Act with respect to § 1982); Farber, *Statutory Interpretation, Legislative Inaction, and Civil Rights,* 87 Mich.L.Rev. 2, 4–7 (1988) (reviewing 1874 recodification of § 1981); Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981,* 99 Yale L.J. 541 (1989) (reviewing history of Civil Rights Act of 1866). Under its power to eradicate involuntary servitude throughout the nation, Congress passed this law to ensure that all of the badges and incidents of slavery likewise faded into an ignominious past. *The Civil Rights Cases,* 109 U.S. 3, 21, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883) ("Congress has a right to enact all necessary and proper laws for the obliteration and prevention of slavery with all its badges and incidents...."). Congress designed the Civil Rights Act of 1866 to ensure "that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white...." *Jones,* 392 U.S. at 409, 88 S.Ct. at 2187–88.

The 1964 Civil Rights Act, although similarly intended to eradicate forms of discrimination, came from a different congressional power, namely the power to regulate commerce among the several states. U.S. Const. art. I, § 8, cl. 3. Despite the fact that it believed it could enact the law pursuant to the powers in the Fourteenth Amendment, Congress instead chose to approach the problem of race discrimination through regulating commerce. S.Rep. No. 872, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.Code Cong. & Admin.News 2355, 2366–68. Its determination to exclude private clubs from coverage reflects, therefore, a determination that such clubs did not have a sufficient impact on interstate commerce to warrant regulation under the Commerce Clause. That conclusion does not imply, however, that the regulation of contracts made by private clubs

exceeds Congress's power from all provisions of the Constitution.

Our conclusion in *NAACP v. Detroit Police Officers Association*, 900 F.2d 903 (6th Cir.1990), is not to the contrary. There, the Court applied the bona fide seniority plan exception in § 703(h) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(h) (1982), to a § 1981 action. The Court noted, however, that the § 703(h) exception would not apply in cases of intentional discrimination. *Id.* at 908.[4] In the case now before us, the plaintiffs have alleged sufficient facts to survive summary judgment because the facts they allege support a finding of intentional discrimination by Local 555.

■ We therefore hold that plaintiffs can maintain a cause of action under § 1981 for refusal to contract without regard to the private club exemption of Title II. The plaintiffs do not seek to become members of Local 555. They seek relief because Local 555 refused on the basis of race to a make contract to serve them beverages. Because we determine that Title II does not affect the application of § 1981 to the making of contracts with private clubs, we need not reach the question of whether Local 555 or the Grand Aerie are private clubs for purposes of § 2000a(e).

■ We also need not reach the merits of plaintiffs' action under Title II because it appears that plaintiffs have not exhausted their administrative remedies as required by Title II. Section 2000a–3(c) requires that plaintiffs refer their complaint to a state agency for resolution before proceeding in federal court. The state must have a chance to resolve the dispute if it has a law on the subject. *Hornick v. Noyes*, 708 F.2d 321 (7th Cir.1983), *cert. denied*, 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984); *Harris v. Ericson*, 457 F.2d 765, 766 (10th Cir.1972); *see also Hallstrom v. Tillamook County*, — U.S. ——, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (sixty-day waiting period under Resource Conservation and Recovery Act of 1976 mandatory and district court should dismiss complaint and not hold case in abeyance); *cf. Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (sixty-day requirement under Age Discrimination in Employment Act permits district court to hold complaint in abeyance pending outcome of state proceedings). Ohio has a law establishing a Civil Rights Commission designed to hear these kinds of disputes. Ohio Rev.Code Ann. § 4112.02(G) (Baldwin Supp.1989) (prohibiting discrimination in public accommodations); Ohio Rev.Code Ann. § 4112.05 (Baldwin Supp.1989) (dispute resolution performed by Ohio Civil Rights Commission). Plaintiffs have not demonstrated that they notified the Ohio Civil Rights Commission before filing suit as required by 42 U.S.C. § 2000a–3(c), but only notified the state agency after their suit was pending before the District Court. We therefore remand the case to the District Court to determine whether this meets the requirements of § 2000a–3(c).

■ In addition, Title II entitles successful plaintiffs to injunctive relief only. *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam). It is unclear whether plaintiffs are entitled to injunctive relief in this case. They have not demanded membership in Local 555 or its Ladies Auxiliary, nor have they demonstrated that it is likely that they intend to become guests of Local 555 in the future. They might not have standing to bring this suit. On remand, the District Court should determine in the first instance whether the plaintiffs have met the state agency notification requirements and after the court determines whether the plaintiffs have standing to pursue the injunctive relief they seek, the plaintiffs are free to seek review of their Title II claims. Should the Watsons fail to demonstrate their compliance with the Title II filing requirements, the District Court

---

**4.** In addition, the Court noted that the plaintiffs had originally filed their complaint under Title VII as well as § 1981, 900 F.2d at 907 n. 4, and that the plaintiffs' § 1981 claim might not survive the limitation on § 1981 actions announced in *Patterson. Id.* at 912 n. 10.

should dismiss the Title II portion of their complaint.

## III. THE SECTION 1981 ACTION

Section 1981 provides that

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

42 U.S.C. § 1981 (1982). The plaintiffs' allegations must be evaluated according to the standards for § 1981 cases developed in *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The Court held in *Patterson* that an employee could not sue under § 1981 for racial harassment on the job. The Court held that § 1981 applied only to the formation and enforcement of contracts; it did not apply to breaches of contracts. The Court focused on the language "make and enforce contracts," and held that the facts of racial harassment only amounted to a claim for breach of contract. Defendant's conduct did not prevent Ms. Patterson from making a contract, *i.e.*, securing employment with the credit union. She could not show that the terms of her employment contract were dictated by her race or that she was forced to accept racial harassment in order to secure the job. The Court also held that Ms. Patterson could not show that racial harassment prevented her from enforcing that contract in the event of breach because she could still turn either to state or to other federal remedies for relief after the breach occurred.

■ In short, the *Patterson* case forces the Watsons to show that they attempted to form a contract and could not do so because of their race. The only contract raised in these facts is Mr. Watson's attempt to purchase two soft drinks from Local 555 as a guest. The club in the deposition of its Secretary, Louis Trunzo, admits that guests were permitted to buy soft drinks which was all the Watsons wanted to buy. Local 555 asked Ivory Watson to leave the club to avoid having to contract with him. This act constitutes a violation of § 1981 because, on the facts

alleged, no white guests were removed from the club in order to prevent them from purchasing soft drinks. Thus the Watsons were denied the "same right to make contracts ... as is enjoyed by white citizens."

The fact that the Watsons were never refused service in this case is not controlling. If they were asked to leave in order to prevent them from purchasing soft drinks (it is undisputed that guests could purchase soft drinks and the Watsons intended only to purchase soft drinks), requesting them to leave in order to prevent them from purchasing soft drinks could be found to be merely the method used to refuse to contract. Were it otherwise, commercial establishments could avoid liability merely by refusing minorities entrance to the establishment before they had the chance to order.

■ Even though we find that § 1981 applies here, the Eagles argue that it is exempt from the coverage of § 1981 because of its First Amendment interest in associational freedom. The Supreme Court, however, has accorded little protection to groups like the Eagle under the First Amendment. In *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Court distinguished two types of organizations that receive First Amendment protection. The first type consists of groups that are intimate and family-like. These groups have "a high degree of selectivity in decisions to begin and maintain the affiliation," *id.* at 620, 104 S.Ct. at 3250, have little business done within the association, and have ties similar to the intimate bonds of familial relations. The second type of group is the political association. These groups have a shared political goal that is fairly well-defined. *Id.* at 618, 104 S.Ct. at 3249. The Court held that the Jaycees did not fit into either category. The Court later held that other groups would not receive constitutional protection. *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (facial challenge to city ordinance prohibiting discrimination in clubs with over 400 members that

provide regular meal or other services to members fails); *Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (California antidiscrimination law applies to all-male international club of 907,750 members that attempted to expel local club that admitted women because proceedings and club halls open to visitors, and club constantly sought members despite limit on types of members). All three of these cases involved the application of state laws to allegedly private clubs. None of those laws were constitutionally infirm.

From what the record reveals about the Eagles, it does not fit into either one of the categories for constitutional protection. While the constitution of the Grand Aerie mentions rituals and ritualistic objects, the main activity of the club does not seem to be performing those rituals. They are never elaborated in the record. Similarly, while the Eagles, like many such groups, may have secret handshakes and special signals to each other, these do not rise to the level of intimate associations protected under the First Amendment. Indeed, counsel for Local 555 suggested that one purpose of the members was "just to get potted." The group is a private drinking club with some recreational activities that runs its cash bar and banquet hall as a quasi-business ventures. Similarly, the Eagles has no political purpose that would require First Amendment protection. It seems to be simply a drinking club. As such, the application of § 1981 to its conduct does not violate the freedom to associate.

### IV. THE LIABILITY OF THE GRAND AERIE

■ In addition to suing Local 555, the Watsons have sued the Grand Aerie under § 1981. The Watsons have introduced no evidence, however, that the Grand Aerie engaged in any discrimination on the basis of race or that the Grand Aerie refused to make a contract with them. While doctrines of vicarious liability have been applied on occasion in § 1981 cases, *e.g. Springer v. Seaman*, 821 F.2d 871 (1st Cir.1987) (respondeat superior applied); *see*

*also General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. at 392, 102 S.Ct. at 3151 (agency relationship required), the Watsons have not introduced evidence showing that the Grand Aerie controls Local 555, exerts any influence over it, or otherwise has a relationship in which the Grand Aerie would have to answer for Local 555's actions. *Cf. Restatement (Second) of Agency* § 220 (1958) (listing factors determining servant status). The Grand Aerie does not own or operate any of the Locals. It has introduced uncontroverted evidence that it leaves all membership and guest policies up to the local Aeries, and apparently does not own or operate the bar or banquet hall. Even though it appears that it owns certain club property upon the dissolution of Local 555, this relationship is too remote to make the Grand Aerie liable for Local 555's allegedly discriminatory acts. As a result, we find that the Watsons have no cause of action against the Grand Aerie under § 1981.

### V. CONCLUSION

Accordingly, the judgment of the District Court is AFFIRMED with respect to the Grand Aerie, REVERSED with respect to Local 555, and REMANDED for further proceedings not inconsistent with this opinion.