Dennis JONES, et al., Plaintiffs,

v.

**PEPSI COLA BOTTLING COMPANY, INC., and Local Union No. 337, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants.**

No. 91–CV–72297.

United States District Court,
E.D. Michigan, S.D.

April 23, 1993.

Richard E. Lieberman, Mark N. Woyar and Roxanne A. Ablan, Ross & Hardies, Chicago, IL, Richard R. Boisseau and James H. Coil, III, Kilpatrick & Cody, Atlanta, GA, Ulysses W. Boykin, Lewis, White & Clay, Detroit, MI, for defendant Pepsi–Cola.

Harvey I. Wax, Michael Kimber and Teresa T. McGuire, Levin, Garvett & Dill, P.C., Southfield, MI, for plaintiffs.

George R. Geller, Farmington, MI, for defendant Local Union No. 337, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

## OPINION AND ORDER

FEIKENS, District Judge.

### Introduction

Plaintiffs, former unionized workers at Pepsi Cola's now closed Exeter Avenue bottling plant in Detroit, Michigan, have filed a twelve-count Complaint against defendant Pepsi Cola Bottling Company ("Pepsi") and defendant Local Union No. 337, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 337"). Defendant Pepsi has filed a motion to dismiss Counts I, IV, V, and VI; this motion is GRANTED. Defendant Local 337 has filed a motion to dismiss Counts I, II, III, VI, and XI and for sanctions; except for Local 337's request for sanctions, this motion is GRANTED. Pepsi has also filed a motion for sanctions against plaintiffs and their attorney for refusing to dismiss Count I; this motion is DENIED. Several sets of briefs have been filed, and oral arguments were held on April 13, 1993.

### Background

Plaintiffs, approximately sixty-four former unionized employees of Pepsi who worked in the production department at Pepsi's now defunct Exeter Avenue plant in Detroit, were represented by Local 337, and the terms and conditions of their employment were governed by a collective bargaining agreement ("CBA") between Pepsi and Local 337. In 1989, Pepsi announced its intention to close the Exeter plant and build a new plant in the City of Detroit to be known as the Detroit Distribution and Production Center ("DPC").

According to plaintiffs, Pepsi sought from the Detroit City Council a twelve-year $6 million property tax abatement; as inducement for such abatement, Pepsi promised that seventy employees, many of whom are plaintiffs in this case, would be transferred from the Exeter Avenue facility to the new plant.

As operations at the Exeter Avenue plant came to a halt, Pepsi and Local 337 negotiated a plant closing agreement regarding the terms and conditions which would govern the closure of the plant. Employees who were not transferred to the new facility or another Pepsi facility were laid off in February 1991. Some of the plaintiffs were among the employees who did not transfer to a different facility and some of them were laid off.

In order to apply for work at the new assembly plant, Exeter Avenue production employees were required to pass a written test. Plaintiffs say Pepsi imposed this requirement only on Exeter Avenue production employees; no such transfer prerequisite was imposed on any other bargaining unit employees. Approximately 75% of the production employees at the Exeter Avenue plant were black with high seniority. Approximately 10% were female with high seniority. Approximately 16% were over 40 years of age with high seniority. Approximately 50% were unmarried. Plaintiffs say the written test did not measure in any way an employee's abilities or qualifications to perform production jobs in the new plant.

Those Exeter Avenue production employees who achieved the minimum cut-off score on the written test underwent Group Assessment Exercises which plaintiffs say were nothing more than subjective interviews irrelevant to the ability of the employees to perform production jobs. Only four Exeter Avenue production employees achieved a passing score on the Group Assessment Exercise; all of whom were white males with seniority of less than ten years. These four white males were given production jobs at the new facility. Pepsi filled the remaining production jobs at the new facility with new hires who had never worked for Pepsi before and who were not represented by the Team-

sters Union. Plaintiffs claim they were all qualified to perform the production work at the new facility.

Specifically, in Count I, plaintiffs claim a breach of the CBA by Pepsi and a breach of Local 337's duty of fair representation because plaintiffs' preferential hiring rights as set forth in Article XXXII of the CBA were allegedly violated. Plaintiffs claim Local 337 violated section 8(b)(1)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A). Count II alleges a breach of duty of fair representation by Local 337 because Local 337 did not submit the plant closing agreement to a vote of the membership as allegedly required by Local 337's bylaws. Plaintiffs claim the plant closing agreement amended the CBA and therefore the members were entitled to vote on it. Plaintiffs say this breach of duty to fairly represent them under section 9(a) of NLRA, 29 U.S.C. § 159(a), amounts to a violation under section 8(b)(1)(A) of NLRA. Count III alleges the same actions in Count II; Count III claims that such actions amount to a breach of section 411(a)(1) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1).

Count IV claims plaintiffs where intended third-party beneficiaries of a contract between the City of Detroit ("City") and Pepsi in which the City gave Pepsi real property tax abatements in consideration of Pepsi's promise and commitment that no one would lose a job and that 70 employees would be transferred from the Exeter Avenue facility to the new plant. Count V says Pepsi's failure to transfer those plaintiffs who are black to the new plant violated their 42 U.S.C. § 1981 rights. Specifically, plaintiffs claim Pepsi refused to transfer these plaintiffs to the new facility, refused to honor their preferential hiring rights, and permanently terminated their seniority and employment because of their race.

Count VI says both Pepsi and Local 337, motivated by racial and gender animus, conspired to deprive plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3). Allegedly, defendants deprived these plaintiffs of their legal right to preferential hiring and transfer rights to the new Pepsi facility and caused the permanent termination of their employment and loss of their seniority rights.

Count VII claims that Pepsi treated those plaintiffs who are black or Hispanic in a racially discriminatory manner by subjecting them to an employment selection process with a disparate impact on them in violation of the Elliott–Larsen Civil Rights Act, M.C.L. §§ 37.2101 *et seq.* Count VIII claims that Pepsi treated those plaintiffs who are women in a discriminatory manner based upon their sex by subjecting them to an employment selection process with a disparate impact on them in violation of the Elliott–Larsen Civil Rights Act. Count IX claims that Pepsi treated those plaintiffs over 40 years of age in a discriminatory manner based upon age by subjecting them to an employment selection process with a disparate impact on them in violation of the Elliott–Larsen Civil Rights Act. Count X claims that Pepsi treated those plaintiffs who are unmarried in a discriminatory manner based upon their unmarried status by subjecting them to an employment selection process with a disparate impact on them in violation of the Elliott–Larsen Civil Rights Act.

Count XI claims that those persons identified in Counts VII–X were treated in a discriminatory manner by Pepsi and Local 337 and were denied an opportunity to exercise their preferential hiring rights to transfer to the new plant and were permanently terminated and lost pension benefits because they were members of one or more of those protected groups in violation of the Elliott–Larsen Civil Rights Act. Specifically, with regard to Local 337, plaintiffs claim Local 337's failure to pursue to arbitration a grievance protesting the violation of plaintiffs' alleged preferential hiring rights resulted in Local 337 acquiescing in Pepsi's discriminatory procedures. Plaintiffs claim such alleged action by Local 337 violated section 204 of the Elliott–Larsen Act, M.C.L. § 37.2204.

Count XII claims that Pepsi violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*, with regard to all plaintiffs.

Defendants do not ask for dismissal of Counts VII–X and XII. Defendant Pepsi does not ask for dismissal of Count XI as it applies to Pepsi.

## Analysis

### I. Count I

██ Both defendants seek dismissal of Count I, which alleges that Pepsi violated plaintiffs' preferential hiring rights under Article XXXII of the CBA when it failed to transfer plaintiffs to the new DPC. Also, it alleges that Local 337 breached its duty of fair representation by failing to process plaintiffs' preferential hiring rights grievance to arbitration.

Article XXXII of the CBA, entitled "Transfer of Work", states in relevant part:

In the event that the Company [Pepsi] opens a new producing facility in the Detroit Metropolitan Area and closes the Exeter Avenue Plant and production work currently being done at the Exeter Plant is transferred to the new facility, production department employees at the Exeter Avenue Plan shall be given preferential hiring rights at the new facility to the extent of the number of employees required at the new facility. The status of the transferred employees shall be governed by the contract or practice at the new facility. Employees who exercise preferential hiring rights must qualify on any new equipment.

On October 9, 1991, I stayed proceedings in this case pending the outcome of a scheduled arbitration between Pepsi and Local 337 before Arbitrator David T. Borland; the arbitration involved the same preferential hiring rights grievance that plaintiffs claim in this count. On December 12, 1992, Arbitrator Borland issued his opinion and award denying the preferential hiring rights grievance. In denying the grievance, the Arbitrator determined that the grievants (many of whom are plaintiffs in this action) were not entitled to preferential hiring rights at the DPC under Article XXXII because Article XXXII provided preferential hiring rights at the DPC only if there was a transfer to the DPC of "production work currently being done at the Exeter Avenue Plant." *Arbitrator's opinion and award* at pp. 53–55. Since

the requisite transfer of work to the DPC never took place, preferential hiring rights had not arisen under Article XXXII. *Id.*

Defendant Pepsi argues that this court should give Arbitrator Borland's decision a binding and conclusive effect and that this court should dismiss Count I's cause of action against Pepsi. I agree.

Article VII of the CBA provides that the exclusive procedure for the resolution of disputes over the interpretation or application of the contents of the CBA is through final and binding arbitration. *Complaint*, para. 12. As applied here, Article VII dictates that Arbitrator Borland's interpretation of Article XXXII is final and binding upon Pepsi, Local 337, and the involved employees. Case law dictates this result as well. *See United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960):

[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

Defendant Local 337 notes that Count I alleges a cause of action against it for failing to pursue the preferential hiring rights grievance to arbitration. Local 337 argues that because it has now pursued this grievance to arbitration, Count I's cause of action against it should be dismissed. I agree.

Local 337 participated in five and one-half days of hearings addressing the preferential hiring rights grievance and presented a lengthy case in support of that grievance. The arbitration generated 1,100 pages of testimony from twenty witnesses as well as hundreds of pages of exhibits. Of course, Local 337 losing the grievance and Pepsi winning it is irrelevant to the cause of action alleged against Local 337.

██ Nonetheless, plaintiffs argue Count I should not be dismissed. Plaintiffs contend

Local 337's promise to arbitrate was precipitated by the filing of this lawsuit and not by Local 337's statutory duty. This is irrelevant, though, since Local 337 eventually did arbitrate the grievances, thereby satisfying its statutory duty.

Plaintiffs say neither defendant treated the arbitration scheduling with any sense of urgency, and that the arbitration was spread over a six-month period. This too is irrelevant unless, perhaps, defendants intentionally delayed the proceedings in order to prejudice the arbitrator's decision; however, plaintiffs do not allege this.

■ Plaintiffs contend Local 337 failed to call two key Local 337 officials whose testimony Local 337 knew was essential to refute damaging remarks attributed to those officials by Pepsi witnesses. Where a union's presentation of a grievance taints the arbitrator's decision, the award can be set aside. *Wood v. International Brotherhood of Teamsters, etc., Local 406,* 807 F.2d 493 (6th Cir. 1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). According to plaintiffs, while the court in *Wood* did not find sufficient evidence to set aside the arbitrator's award, it based its decision, in part, on the fact that the employees' position had been fully developed before the arbitrator by the employees' attorney.

In reality, the court in *Wood* said that:

Even in the event of a union's breach of its duty to fair representation, an arbitration award is not quickly set aside.... [T]o vacate an arbitration award on this ground there must be two findings. First, the Union must have breached its duty of fair representation to the employee. Second, the breach of duty by the Union must have tainted the arbitrator's decision. The breach must have contributed to the arbitrator's making an erroneous decision.

*Id.* at 500 (citation omitted). The court in *Wood* said that even though there was evidence in the case of the union's breach of duty of fair representation, there was no reason to believe that such a breach tainted the decision of the arbitrator because plaintiffs' own attorneys presented their position to the arbitrator. These attorneys were permitted to examine witnesses, offer evidence, and participate fully in the four-day hearing before the arbitrator.

■ In the case at hand, it is true that plaintiffs' attorney was not allowed to actively participate in the grievance proceedings. The grievants were represented by their union's attorney. However, I have already found above that Local 337 has not breached its duty of fair representation. Further, a union's good faith decision regarding the evidence it will present in an arbitration cannot amount to a breach of the duty, even if the union's decision proves to have been mistaken. *Barr v. United Parcel Service, Inc.,* 868 F.2d 36, 44 (2d Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989). Because plaintiffs have not satisfied the first prong of *Wood,* the inquiry ends here.

A more relevant question may be whether Local 337's attorney competently performed during the arbitration proceeding. Plaintiffs do not argue the attorney performed incompetently. I am in no position to second-guess the Local 337 attorney's strategic choice in allegedly not asking two key Local 337 witnesses to testify.

Further, plaintiffs request that Count I not be dismissed before they have a chance to conduct discovery; they say such discovery could lead to evidence supporting allegations of a conspiracy between the defendants to deprive plaintiffs of their jobs. According to plaintiffs, such a conspiracy might demonstrate the arbitration was tainted and thus breathe new life into Count I. Plaintiffs are simply asking this court to allow them to conduct a fishing expedition. Plaintiffs have no proof at this time of any kind of conspiracy to affect the arbitrator's decision. I will not allow plaintiffs to engage in such abusive discovery. Thus, Count I's claims against both defendants are dismissed.

## II. *Counts II and III*

■ Defendant Local 337 argues that these counts must be dismissed as well. These counts center on plaintiffs' contention that Local 337 was obligated by its bylaws to submit the plant closing agreement it negotiated for its members at the Exeter Avenue plant in December 1990 to a vote of those

members. Plaintiffs contend section 26 of Local 337's bylaws privileged them to vote on all collective bargaining agreements affecting them and that a plant closing agreement should be considered a collective bargaining agreement within the meaning of the bylaw. Section 26 provides in part:

> Whenever a Collective Bargaining Agreement is about to be negotiated, modified or extended at the request of this Local Union, the President shall call a meeting at which the membership shall determine and authorize bargaining demands to be made.... Proposed Collective Bargaining Agreements or amendments [thereto] shall be submitted by the Secretary Treasurer of the Joint Council and Area Conference, as required by the Area Conference bylaws, for approval before submission to the employer.... Ratification of agreements or amendments shall be subject to vote in the same manner as provided for in connection with bargaining demands as set forth in Section 26(a), or in the case of area wide or conference wide agreements in accordance with the constitution and rules adopted by such bargaining group.

Plaintiffs concede that bylaw section 26 does not list plant closing agreements among the requirements which require ratification. Nonetheless, plaintiffs argue the plant closing agreement is an amendment to the CBA, and section 26 requires ratification of amendments to the CBA.

Using several examples, plaintiffs attempt to show how the plant closing agreement modifies the CBA. In each instance, however, Local 337 successfully shows that each situation did not amount to a modification. First, according to plaintiffs, paragraph 1(c) of the closing agreement says that any production employee who was not working on a full-time basis on December 3, 1990, is not entitled to any further benefits or employment considerations; the CBA guaranteed such benefits and considerations through October 6, 1991. It is true that Exeter Avenue plant employees on layoff or leave at the time of the plant closing are cut off from a benefit. However, the benefit is one of severance payments which arises only under the plant closing agreement; these particular employees are not cut off from a benefit arising under the CBA.

Second, plaintiffs contend paragraphs 3, 5, and 6 of the closing agreement cut off and abolish the exercise of bumping rights of plaintiffs; previously, these rights were open ended. Under the CBA, though, this bumping right could arise only in a plant closing context. Confronted with such a situation, Local 337 and Pepsi set a deadline for bumping in the plant closing agreement. The CBA is silent on the procedures for setting a bumping deadline. Such silence arguably allows Local 337 and Pepsi, in a future plant closing agreement, to set a bumping deadline for purposes of efficient administration of the CBA.

Third, plaintiffs claim paragraph 11 of the plant closing agreement limits production employees' seniority recall and bidding rights to two years; previously, those rights were of indefinite duration under the CBA. However, Article VI of the CBA states: "Seniority shall be broken only by discharge, voluntary quit, retirement or layoff for a period of more than two years." Thus, such rights were not of indefinite duration under the CBA.

Fourth, it is true that paragraph 17 of the plant closing agreement precludes the processing of any grievance by production employees if the grievance is filed after December 12, 1990, and is contrary to the intent of the closing agreement. However, plaintiffs do not suggest any person who was injured by this administrative cut-off action.

Thus, despite all of plaintiffs' examples, the plant closing agreement does not amend the CBA. Indeed, Local 337 and Pepsi never intended the plant closing agreement to amend the CBA. Paragraph 21 of the plant closing agreement states:

> The provisions of this Agreement do not vary or contradict the terms of the Contract [CBA]. To the extent this Agreement covers matters that are also covered by the Contract, it sets forth the mutual understanding of the parties as to the meaning of the Contract.

Further, by stating that a plant closing agreement is not an amendment to a CBA,

Local 337 is interpreting its own bylaws. Specifically, Local 337 interprets the phrase "collective bargaining agreement" to refer only to traditional labor contracts (*i.e.*, those agreements governing all aspects of the employer-employee relationship in a shop or factory over a term of years). By contrast, a plant closing agreement fixes employee rights in the limited one-time setting of plant shutdown; it is, in effect, a severance agreement. Local 337 has consistently negotiated and signed plant closing agreements without submitting them to a membership vote. Local 337's interpretation of the phrase "collective bargaining agreement" in its own bylaw is entitled to great weight by this court. "Courts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable." *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir.1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1768, 32 L.Ed.2d 135 (1972). *See also Smith v. General Committee of Adjustment of Union Pacific Eastern Region*, 767 F.Supp. 1012, 1016 (E.D.Mo.1991), in which the court upheld the union's determination that its members had no right to ratify a merger agreement adjusting their seniority rights following the merger of two railroads, even though union bylaws privileged members to vote on local agreements affecting them.

Local 337's interpretation of "collective bargaining agreement" as not including a plant closing agreement is fair and reasonable as well as practical. Employees facing an announced plant closing have no incentive to approve any closing that does not deliver fantastic benefits. These employees would reason that intransigence could not cost them their jobs since their jobs are already lost. By contrast, in true collective bargaining for a traditional multi-year contract, employees who refuse to ratify it do so with full consciousness of the risk to their jobs that strike action might entail.

Nevertheless plaintiffs argue that even if the closing agreement did not modify employees' rights under the CBA, the union's relinquishment of its continuing obligation to represent Pepsi production employees in De-

troit was a matter that plaintiffs had a right to approve or reject as a matter of law. Plaintiffs say that as part of the closing agreement, the union relinquished plaintiffs' NLRA section seven rights; specifically plaintiffs say Local 337 relinquished plaintiffs' rights to continued representation by the bargaining unit agent which plaintiffs had elected to represent them. Plaintiffs cite *National Labor Relations Board v. Magnavox Co. of Tennessee*, 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974), for the proposition that a union which relinquishes or bargains away its representational status without obtaining the consent of those whom it represents commits an unfair labor practice.

However, Local 337 could not have relinquished plaintiffs' rights because there was nothing to relinquish. No matter what Local 337 did or said, Pepsi was going to close the Exeter Avenue facility. Second, workers at the new DPC were not going to be represented by Local 337. Third, as Arbitrator Borland held, employees at the Exeter Avenue facility had no preferential hiring right under the CBA between Pepsi and Local 337 to transfer to the new DPC. Thus, any sort of termination of the relationship between Local 337 and its members employed at the Exeter Avenue facility occurred because of the actions of Pepsi, not Local 337. Local 337 did not suddenly say it was no longer going to represent the production employees at the Exeter Avenue facility. Instead, these employees represented by Local 337 were losing their jobs. There was simply no one left for Local 337 to represent. This is why Local 337's status as bargaining unit agent ceased.

III. *Count IV*

In Count IV, plaintiffs allege they were the intended third-party beneficiaries of a contract between the City of Detroit and Pepsi, wherein the City granted Pepsi a tax abatement for the new DPC in return for Pepsi's promise to transfer Exeter Avenue employees to the new DPC. Plaintiffs claim that under M.C.L. § 600.1405 they have the same right to enforce this alleged promise to transfer the employees, as though the promise

was made directly to them. Defendant Pepsi asks for the dismissal of Count IV. I GRANT this request.

■ First, as a matter of law, no contract existed between the City and Pepsi. The act of applying for and being granted a tax exemption under M.C.L. §§ 207.551 *et seq.* ("the Plan Rehabilitation and Industrial Development Districts Act") does not involve the formation of any contractual relationship. The State Tax Commission is the only body with authority to grant the tax exemption. M.C.L. § 207.557. The legislative body of the local governmental unit can only approve or disapprove applications for industrial facilities exemption certificates. M.C.L.A. § 207.556.

Similarly, the Michigan Attorney General has opined that under this statute, a tax abatement application does not constitute a contract. 1981 Mich. AG LEXIS 105; OAG, 1981–1982, No. 5916 (June 8, 1981). M.C.L. §§ 207.551 *et seq.* "does not authorize local governmental units to contract for industrial facilities exemption certificates for the grant of property tax exemption. It is the legislature which grants the exemption in the act, and not the municipality." *Id.* at *5. The Michigan Attorney General has also opined that an act granting a property tax exemption for urban redevelopment which does not authorize local government to contract with a redevelopment corporation for the grant of the property tax exemption does not violate Article 9, § 2 of the Michigan Constitution. 1979 Mich. AG LEXIS 136; OAG, 1979–1980, No. 5484 (April 19, 1979). Article 9, § 1 of the Michigan Constitution places the power of taxation in the hands of the Michigan legislature. Article 9, § 2 states: "The power of taxation shall never be surrendered, suspended, or contracted away."

Although plaintiffs do not so allege in their Complaint, they appear to argue a third-party beneficiary/promissory estoppel theory. In other words, plaintiffs contend that the City relied on Pepsi's promise to transfer Exeter Avenue employees to the new DPC when the City recommended a tax exemption for Pepsi to the State Tax Commission. Because plaintiffs were the intended beneficiaries of Pepsi's promise and the City's reli-

ance, plaintiffs say they have standing to sue. The only case plaintiffs cite for this unique third-party beneficiary/promissory estoppel theory is *Charter Township of Ypsilanti v. General Motors Corporation*, Washtenaw Cir.Ct. No. 92–43075–CK, 1993 WL 132385 (February 9, 1993). In *Ypsilanti*, the plaintiffs (the township, county and state governments) claimed that defendant General Motors promised it would not close the Willow Run Assembly Plant if it received tax abatements. The opinion in *Ypsilanti* concentrated on the defendant's promise to the plaintiffs and their reliance upon it. There was no discussion in *Ypsilanti* of any sort of third-party beneficiary/promissory estoppel theory. Thus, *Ypsilanti* is off-point. Moreover, *Ypsilanti* is on expedited appeal to the Michigan Court of Appeals, and any relevance it could have is therefore entitled to very little weight.

■ Second, even if a contract did exist between Pepsi and the City, it would be preempted by federal labor law because the alleged contract intrudes upon the collective bargaining relationship between Pepsi and Local 337. Plaintiffs' state law contract action, seeking to enforce a contract allegedly negotiated between Pepsi and the City with no participation by the employees' duly elected bargaining representative, is preempted by the National Labor Relations Act.

"The National Labor Relations Act makes it the duty of the employer to bargain collectively with the chosen representatives of his employees. The obligation being exclusive, . . . it exacts 'the negative duty to treat with no other'" *Medo Photo Supply Corp. v. National Labor Relations Board*, 321 U.S. 678, 683–84, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944) (citations omitted). Disregard of the employees' representative in the bargaining process constitutes an unfair labor practice. *Id.* at 684, 64 S.Ct. at 833. Thus, enforcement of the alleged third-party beneficiary contract would violate the federal principle of exclusive representation.

■ Further, plaintiffs' third-party beneficiary contract action is preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, because resolution of plain-

tiffs' claim would involve the same subject matter (transfer right) contained in the collective bargaining agreement. "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as preempted by federal labor-contract law." *Allis–Chalmers Corporation v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985). The dispute underlying the state law contract action—failure to transfer—necessarily requires a court to consider the terms of Article XXXII of the CBA which governs possible employee transfer. Thus, because plaintiffs' state law contract action is based upon a subject matter governed by the CBA, it can not be resolved without resort to and interpretation of the CBA. *See, e.g., Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 249 (6th Cir.1986). Arbitrator Borland has interpreted the CBA as not giving plaintiffs any preferential transfer rights to the new DPC. As such, this count must be dismissed.

## IV. Count V

■ Count V claims that Pepsi's failure to transfer plaintiffs to the new facility and the concurrent termination of their employment violates their civil rights as guaranteed by 42 U.S.C. § 1981. Pepsi says that because the acts complained of by plaintiffs relate to conduct which occurred after plaintiffs were employed by Pepsi, section 1981 does not apply. Post-hiring conduct does not fall within any of the enumerated rights protected by section 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164, 183, 109 S.Ct. 2363, 2376, 105 L.Ed.2d 132 (1989).[1]

■ Plaintiffs argue that despite *Patterson* they can still state a section 1981 claim. Plaintiffs say that their employment rights at the new facility would have constituted a new contract; Pepsi's refusal to transfer plaintiffs to the new facility, allegedly because of their race, thereby means Pepsi prevented plaintiffs from forming a new contract. Plaintiffs analogize to *Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir.1990), in which black guests were removed from a private club allegedly to prevent them from purchasing soft drinks. The court said that plaintiffs could maintain a section 1981 cause of action for the defendant's refusal to enter into a contract for the sale of drinks. Thus, plaintiffs say *Patterson* does not prevent them from stating a section 1981 claim.

Nonetheless, despite plaintiffs' attempts to dress up Pepsi's failure to transfer them as a failure to hire claim, the Complaint states otherwise. Indeed Count V itself alleges that: "PEPSI refused to transfer Plaintiffs ... to its new facility, refused to honor their preferential hiring rights, and permanently terminated their seniority and employment because of their race." *Complaint*, para. 76. Arbitrator Borland has held that plaintiffs had no preferential hiring rights; thus, this specific allegation can be excised. The remaining allegations (refusal to transfer and termination of seniority and employment) are post-contract formation occurrences which *Patterson* says section 1981 does not cover.

Aside from the specific words used in the Complaint, it is significant to note that plaintiffs would have been doing the same type of production work at the new plant as at the old Exeter Avenue plant. Plaintiffs would be working for the same employer. Plaintiffs simply would have been working at a different location in the City of Detroit and would no longer be represented by Local 337. Any possible change in the employment relationship would not have been so significant as to amount to a new contract. Thus, *Patterson* says that section 1981 does not apply to the post-formation conduct at issue here.

## V. Count VI

■ Count VI claims that both defendants conspired to deprive plaintiffs of equal protection of the laws and privileges and

---

1. The 1991 Civil Rights Act, Pub.Law. No. 102–166, 105 Stat. 1071 (1991), overruled *Patterson*. Nonetheless, the Complaint in this case was filed before the 1991 Act was passed. The United States Court of Appeals for the Sixth Circuit has held that the 1991 Act does not apply retroactively. *Vogel v. Cincinnati*, 959 F.2d 594, 598 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992).

immunities of the laws in violation of 42 U.S.C. § 1985(3). By virtue of this conspiracy, say plaintiffs, Pepsi deprived plaintiffs of their right to transfer and caused the termination of their employment and seniority rights (under the collective bargaining agreement). Under section 1985(3), "If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," redress is provided for the ensuring injury to person or property.

Section 1985 does not create any independent substantive rights.

It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section.

*Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 376, 99 S.Ct. 2345, 2351, 60 L.Ed.2d 957 (1979).

Both defendants ask for dismissal of this count. The court's dismissal of Counts I, II, III, and XI (see below) against Local 337 means that there are no remaining claims against Local 337 asserting that it violated plaintiffs' substantive rights. Thus, because I have found as a matter of law that Local 337 has not deprived plaintiffs of any legal rights, Local 337 can not be considered a party to a conspiracy. This would leave only Pepsi liable under this count; such can not be the case because it takes two entities to conspire. Thus, this count must be dismissed.

Even if Local 337 were still a party to the suit, I would still dismiss this count. As noted above, section 1985 does not create any independent substantive rights. Plaintiffs claim that their section 1981 rights have been violated by the alleged conspiracy. Thus, plaintiffs' section 1985 depends for its very life on plaintiffs' section 1981 claim. Because I have dismissed plaintiffs' section 1981 claim, I would have to dismiss plaintiffs' section 1985 claim as well.

## VI. *Count XI*

▇▇▇ As this count pertains to Local 337, plaintiffs claim Local 337's failure to pursue to arbitration a grievance protesting the violation of plaintiffs' alleged preferential hiring rights resulted in Local 337 acquiescing in Pepsi's discriminatory procedures. Plaintiffs claim such alleged action by Local 337 violated section 204 of the Elliott–Larsen Civil Rights Act, M.C.L. § 37.2204.

M.C.L. §§ 37.2204(b) and (c) provide in part:

A labor organization shall not: ...

(b) Limit, segregate, or classify membership ... or refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity ... because of religion, race, color, national origin, age, sex. ...

(c) Cause or attempt to cause an employer to violate this article.

Local 337 says that its vigorous arbitration of the preferential hiring rights grievance means that Count XI should be dismissed as alleged against it. Plaintiffs argue that despite the fact that Local 337 took plaintiffs' grievances to arbitration, Local 337 is still liable to plaintiffs under this Elliott–Larsen section if it passively accepted Pepsi's use of a discriminatory test to screen Local 337 members for jobs, without asserting the rights of its members to be free from discrimination.

I agree with Local 337. Employees at the new DPC plant were not going to be represented by Local 337. The only potential link then between Local 337 and the new DPC facility was the preferential hiring rights language in Article XXXII of the CBA. As noted above, Arbitrator Borland decided these preferential hiring rights were inapplicable because there was no transfer to the DPC of "*production work currently being done at the Exeter Avenue Plant.*" *Arbitrator's opinion and award* at p. 53–55. Thus, in the end, there was no link between Local 337 and the new DPC.

▇▇▇ As such, Local 337 had no legal duty to object to any alleged discriminatory proce-

dures used by Pepsi in deciding which Exeter Avenue production employees should be transferred to the new plant. Local 337 did all that it was legally entitled to do: arbitrate the grievances of its members before Arbitrator Borland. Local 337 tried to convince Arbitrator Borland that its members had preferential hiring rights to transfer to the new facility which would make their employment in DPC production jobs automatic. Such automatic transfer would mean that any written tests administered to plaintiffs (which they claim were discriminatory) would have been superfluous. Local 337 lost this argument. Local 337 did all it was legally required to do for its members; a union has no obligation to file lawsuits to enforce its members' non-contractual rights. *Hawkins v. Babcock & Wilcox Co.*, 105 LRRM 3438, 3440 (N.D. Ohio 1980).

As counsel for Local 337 so appropriately stated during oral arguments on this count: even if Local 337 believed Pepsi was discriminatorily transferring individuals to the new non-Local 337 plant, Local 337 would have had no greater legal obligation to halt or complain about such activity than it would have had had it been aware of discriminatory activity by an employer at a non-union plant in Los Angeles, California. As harsh as it may sound, whether Local 337 had a moral or social obligation to halt or complain about such alleged activity by Pepsi is irrelevant. The relevant question is whether Local 337 had a legal obligation. Because the answer is no, this count must be dismissed.

### VII. *Sanctions*

Prior to my staying of proceedings in this case due to the scheduled arbitration between Pepsi and Local 337, defendant Local 337 asked for Fed.R.Civ.P. 11 sanctions to be applied against plaintiffs' counsel. Local 337 argues plaintiffs' counsel was overly anxious and impatient in bringing this lawsuit since he should have awaited the outcome of the scheduled arbitration.

The arbitration, which concerned the exact same preferential hiring rights provision at issue in Count I of the Complaint, has ended in the plaintiffs' disfavor. Plaintiffs' counsel has refused to voluntarily dismiss Count I.

Thus, pursuant to Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and the court's inherent sanctioning power, defendant Pepsi now asks for sanctions to be applied against plaintiffs' counsel for refusing to voluntarily dismiss Count I.

Imposing sanctions on plaintiffs' counsel is a bitter pill to swallow. I have disagreed with all of plaintiffs' counsel's arguments up to this point. However, I do not believe plaintiffs' counsel's arguments and actions were stated or performed in bad faith or in such a frivolous manner as to warrant punishment. *See Chambers v. NASCO, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991); *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir.1986). Similarly, despite my disagreements with plaintiffs' arguments up to this point, I believe plaintiffs' papers filed with this court have met the Rule 11 requirements of, among others, being well grounded in fact and warranted by existing law. Aside from their sanctions requests, defendants are receiving all which they have asked for in their motions before me.

### Conclusion

In summary, defendant Local 337's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED, but its request for sanctions pursuant to Fed.R.Civ.P. 11 is DENIED. Defendant Pepsi's motion to dismiss Counts I, IV, V, and VI of plaintiffs' Complaint is GRANTED. Defendant Pepsi's motion for sanctions against plaintiffs and their attorney for refusal to voluntarily dismiss Count I of the Complaint is DENIED.

IT IS SO ORDERED.